## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )   Crim. No. 04-CR-10336-NMG |
| v. | ) |
| | ) |
| JULIO CARRION SANTIAGO et al. | ) |
| | ) |

## GOVERNMENT'S OPPOSITION TO MOTION OF ZULEIMA REYES (10)
## TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO WIRETAP OF (978) 423-8173

### I.   Introduction

The United States of America, by its attorneys, United States

Attorney Michael J. Sullivan and Assistant U. S. Attorney Denise

Jefferson Casper, hereby opposes the motion of Defendant Zuleima

Reyes ("Reyes") to suppress evidence obtained pursuant to a wiretap

on telephone number (978) 423-8173, bearing international mobile

subscriber identity ("IMSI") 316010005444317, and urban fleet

mobile identifier ("UFMI") number 180*11*57720, which is a Nextel

telephone, subscribed to by Reynaldo Rivera, 235 18th Street, Apt.

204, Dracut, Massachusetts and used by co-defendant Reynaldo Rivera

("Rivera cell phone").[1]

Reyes argues that the interceptions obtained over the Rivera

---

[1]Reyes attacks only the application for the interception of
the Rivera cell phone, but not the subsequent applications to
intercept Target Telephones 1, 2, 3 and the Target Pager used by
co-defendant Julio Santiago or Target Telephone 4 used by co-
defendant Pedro Alberto Miranda (a/k/a Carlos Colon).  Moreover,
Reyes would have no standing to do so since although she was
intercepted via the Rivera cell phone, she was not intercepted
over any of the other Target Telephones.  This response,
therefore, will focus solely on the application to intercept the
Rivera cell phone.

1

cell phone should be suppressed because the government failed to show "necessity" -- that is, Reyes claims that the affidavit submitted by DEA Task Force Agent Terry Hanson in support of the requested interception failed to establish that traditional investigative methods had failed, reasonably appeared unlikely to succeed if tried or were too dangerous, as required by Title 18, United States Code, Section 2518(1)(c) of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq. ("Title III").[2] Specifically, Reyes claims that an undercover agent's ability to make undercover purchases of heroin from Reynaldo Rivera, through his runners, Reyes and co-defendant Santiago Arroyo, "worked quite well to accomplish every purpose lawfully open to investigative agents of the Government, short of a general warrant to conduct an unlimited exploratory investigation prohibited by the Fourth Amendment" (Reyes' Memorandum of Law In Support of Motion to Suppress ["Reyes Mem."], p. 4) and, therefore, defeats any necessity for the interception for the Rivera cell phone. Such argument ignores the specific goals of the investigation, the relative value of the undercover purchases in

---

[2]Among other things, Title III requires each application for an order authorizing electronic surveillance to contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This provision is commonly known as the "necessity requirement." See United States v. Lopez, 300 F.3d 46, 52 (1st Cir. 2002).

2

regard to those goals and the legal standard of necessity required for authorization of interception of wire communications.

Contrary to Reyes' assertions, the affidavit submitted in support of the wiretap amply established that a wiretap on the Rivera cell phone was warranted. Judge Gertner's issuance of the order authorizing the wiretap was supported by a recitation of facts that were more than "minimally adequate" to establish that there was probable cause to believe that the Rivera cell phone was being to used to facilitate drug trafficking, that there was necessity for the interception and that normal investigative procedures had failed, reasonably appeared unlikely to succeed if tried, or were too dangerous. As set forth more fully below, the Court should deny this motion.

## II.  **Factual Background**

Reyes, along with eleven co-defendants, is charged in an eight-count Superseding Indictment. All of the defendants are charged in Count I (charging them with conspiring to distribute and possess with intent to distribute one kilogram or more of heroin between in or about December 2003 to on or about October 15, 2004). Reyes, along with co-defendant Reynaldo Rivera, is also named in substantive counts of possession with intent to distribute and distribution of heroin relating to the sales of heroin to an undercover agent in December 2003 and January 2004.

The charges against the defendants in this matter arose from

3

long-term investigation by Drug Enforcement Administration ("DEA") Special Agent Calice Couchman and DEA Task Force Agent Terry Hanson and other agents and officers of the DEA, the Massachusetts State Police, the Lowell Police Department and the Dracut Police Department into a drug-trafficking organization. The investigation involved information from various sources including but not limited to confidential informants, surveillance, analysis of pen register data and toll records, trash searches, undercover purchases of heroin and interception of wire communications and electronic communications over one telephone used by Rivera, three telephones and a pager used by co-defendant Julio Santiago ("Santiago") and one telephone used by co-defendant Pedro Alberto Miranda ("Miranda"). The wiretap phase of the investigation began with the interception of wire communications occurring over the Rivera cell phone beginning on March 16, 2004. Interception of the Rivera cell phone continued until April 1, 2004.

The goals and progress of the investigation were described at length and in detail in the affidavit from DEA Task Force Agent ("TFA") Terry Hanson submitted in support of the government's application for authorization to intercept wire communications over the Rivera cell phone ("Hanson Affidavit" or "Hanson Aff."). A copy of the Hanson Affidavit is attached hereto as Exhibit 1. As described in more detail in the Hanson Affidavit, in March 2003, DEA began investigating Kevin Rosas, a heroin dealer operating in

4

the Lowell, Massachusetts area. (Hanson Aff. ¶17). As a part of this investigation, DEA Task Force Agent Hanson, acting in an undercover capacity, made four controlled purchases from Rosas totaling over 100 grams of heroin. (Hanson Aff. ¶17). During one of these controlled purchases, Rosas informed the undercover agent that he had three different sources of supply for heroin. (Hanson Aff. ¶17). Surveillance and review of phone records revealed that Rosas met Rivera shortly before Rosas made two of the sales of heroin to the undercover agent and that the Rosas' telephone was in touch with the Rivera cell phone on these occasions. (Hanson Aff. ¶17). As result of this information, it was believed that Rivera had supplied heroin to Rosas on two of the occasions when Rosas sold heroin to the undercover agent. (Hanson Aff. ¶17). Although Rosas was subsequently charged and pled guilty to heroin distribution charges in this Court in December 2003, he did not proffer any information regarding his sources of supply or otherwise cooperate with law enforcement. (Hanson Aff. ¶18).

Investigation of Rivera's drug trafficking continued with information gathered from various confidential informants, identified as CI-1, CI-2 and CI-3. (Hanson Aff. ¶19).[3] Two of the confidential informants had previously provided information to members of the Lowell Police Department. (Hanson Aff. ¶19). CI-1

_____

[3]A fourth confidential informant, CI-4, provided a telephone number for Santiago (Target Telephone 2), but this was only piece of information provided by this source. (Hanson Aff. ¶11, n. 4).

informed DEA that Rivera was one of the largest heroin distributors in Lowell, had numerous drug associates and identified Rosas and co-defendant Jose Torrado as persons who worked for or purchased heroin from Rivera. (Hanson Aff. ¶21). CI-1 also said that Rivera received heroin from Santiago. (Hanson Aff. ¶¶21, 50). In regard to Santiago, CI-1 informed DEA that he was very careful and surveillance-conscious when conducting his drug business including often changing his cellular telephone. (Hanson Aff. ¶22).[4] CI-2 also informed DEA that Rivera was one of the largest heroin dealers in Lowell, but that it had little information about Rivera's supplier other than the supplier was Dominican, was from Lowell and referred to the supplier as a "Ghost." (Hanson Aff. ¶¶24, 51). Specifically, CI-2 said that Rivera supplied several mid-level distributors; that he could supply multiple ounces of heroin; that Rivera had delivered heroin to CI-2 and that Rivera would make deliveries in his black GMC Yukon; that, as of November 2003, Rivera would only take orders of a minimum of 10 grams of heroin and that, as of January 2004, Rivera had been distributing in excess of 100 grams every two days. (Hanson Aff. ¶24). CI-2 also informed DEA that Rivera used a stash location in November 2003 and a different stash location in December 2003. (Hanson Aff. ¶¶25-

[4]Santiago's skill at spotting physical surveillance was confirmed with an agent involved in an unsuccessful investigation of Santiago in 1996. (Hanson Aff. ¶52). Neither the 1996 investigation nor an earlier investigation in 1992 resulted in Santiago's arrest or prosecution. (Hanson Aff. ¶¶59-64).

6

26). CI-2 reported that he had seen a person at Rivera's stash location in November 2003 (whom DEA believed may have been co-defendant Torrado[5]) and that Rivera employed a runner identified as "Santiago" (later identified as co-defendant Arroyo). (Hanson Aff. ¶25). In connection with Rivera's December 2003 stash location at a motel, CI-2 said that a woman was assisting Rivera with his heroin distribution at that time and provided a physical description of this person, but not her identity or name. (Hanson Aff. ¶26). Later investigation revealed that Reyes was renting the room that Rivera was using as a stash location at the time. (Hanson Aff. ¶26).

In the summer of 2003, DEA received information from a confidential informant ("CI-3"), a concerned citizen, who provided information that an individual (later identified as Rivera) was engaged in a series of apparent drug transactions occurring in the parking lot of Rivera's residence at the Old English Village apartment complex at 235 18th Street. (Hanson Aff. ¶¶28-30).[6]

_____

[5]On January 5, 2004, an officer of the Lowell Police Department observed Torrado engage in a hand-to-hand transaction with two males in Lowell. (Hanson Aff. ¶48). Officers subsequently stopped the two men. (Hanson Aff. ¶48). They admitted that they had just purchased heroin from a person they knew as "Jose" (and subsequently identified as Torrado) and from whom they had previously purchased heroin and that they had thrown the heroin out of the car window before they were stopped by police. (Hanson Aff. ¶48).

[6]Trash pulls at this location in July and October 2003 revealed, among other things, telephone numbers for the Rivera cell phone, a paper with various names and various dollar amounts

7

According to CI-3, up until July of 2003, RIVERA had been conducting the above-described transactions most frequently with the occupant of a blue minivan bearing MA registration 5133XA (later identified as Santiago's minivan). (Hanson Aff. ¶30). In addition to observing these meetings, CI-3 also saw Rivera in the same parking lot sitting inside of and working on a black GMC Yukon with MA registration 470YR (the same vehicle that Rivera had been driving when he met with Rosas on two occasions prior to Rosas' heroin sales to an undercover agent). (Hanson Aff. ¶29). On January 18, 2004, CI observed another such meeting between Rivera and a person later identified as Santiago in the parking lot at Old English Village. (Hanson Aff. ¶54). Law enforcement surveillance at the same location on July 29, 2003 and January 26, 2004[7] confirmed that RIVERA met with the operator of the Santiago minivan and Santiago, respectively, and engaged in hand-to-hand exchanges. (Hanson Aff. ¶¶55, 56). Subsequent surveillance at the same

_____

believed to be a drug ledger and bank records. (Hanson Aff. ¶44). Subsequent investigation of the bank records revealed that Rivera had a bank account at Jeanne D'Arc Credit Union and had made cash deposits totaling $46,045 to this account. (Hanson Aff. ¶45).

[7]Initially, law enforcement agents conducted physical surveillance of the parking lot at Old English Village. In December 2003, the agents had a pole camera installed there with a clear view of the parking lot outside of Building #2 where Rivera resided. (Hanson Aff. ¶46). Due to technical problems, however, no recordings were ever made and the camera was discontinued after Rivera's eviction from his residence on February 17, 2004. (Hanson Aff. ¶46).

8

location saw Santiago meet with an unidentified male driving a black Acura Integra in what was believed to be a narcotics sale. (Hanson Aff. ¶57).

Pen register data confirmed contact between Rivera and Santiago, Arroyo and Reyes between November 2003 and February 2004. (Hanson Aff. ¶32). In November 2003, Rivera expressed interest in picking up CI-2's former heroin customers since CI-2 had previously informed him that it was no longer selling heroin. (Hanson Aff. ¶33). After programming DEA TFA Agent Marcos Chavez's undercover telephone number into its cellular telephone as the number of one of its drug customers, CI-2 transferred its cellular telephone to Rivera. (Hanson Aff. ¶33). Thereafter, TFA Agent Chavez, acting in an undercover capacity ("UCA"), conducted several consensually recorded telephone conversations with Rivera and several consensually recorded telephone conversations and meetings with Rivera's runners, Arroyo and Reyes. (Hanson Aff. ¶¶33-43).

In December 2003 and January 2004, the UCA arranged several heroin transactions with Rivera (whom the undercover agent knew only as "Rey"). (Hanson Aff. ¶¶34-43). For these transactions, the UCA would negotiate the price and quantity of heroin and the location (usually Showcase Cinema parking lot in Lowell) to receive the heroin with Rivera (or with Reyes who would then contact Rivera) by telephone. (Hanson Aff. ¶¶34-43). Pen register data showed that Rivera's cell phone was then in contact with telephone

9

subscribed to by one of Rivera's runners. (Hanson Aff. ¶¶34-43). The UCA would then meet one of Rivera's runners, co-defendants Arroyo (on one occasion in December 2003) and Reyes (on occasions in December 2003 and January 2004) to receive the multiple-gram quantities heroin and pay for it. (Hanson Aff. ¶¶34-43). In a series of calls on February 12, 2004, TFA Chavez, Rivera and Reyes negotiated another heroin transaction in which Rivera agreed to sell the UCA eight fingers of heroin. (Hanson Aff. ¶¶10, 12). Although this transaction never took place, surveillance at and around RIVERA's 235 Eighteenth Street residence during the time of the ongoing negotiations saw Santiago and Rivera meet and pen register data showed that phones used by the two were in contact prior to this meeting. (Hanson Aff. ¶12). After this meeting with Santiago, pen register data showed that the Rivera cell phone called the Reyes' cell phone. (Hanson Aff. ¶12). As recounted in the Hanson Affidavit, DEA believed that Santiago was Rivera's source of supply for heroin as of February 2004. (Hanson Aff. ¶11).

The Hanson Affidavit, from which Judge Gertner concluded that the Order authorizing the interception of Rivera cell phone should issue, detailed all these efforts and more. (Hanson Aff. ¶¶8-65). DEA TFA Hanson, a law enforcement officer for over eighteen years who had extensive experience in the investigation of drug traffickers (Hanson Aff. ¶¶2-3), then described the goals of the

10

investigation, Hanson Aff. ¶¶66-68, and meticulously documented his reasons for believing that normal investigative procedures -- including use of confidential informants, undercover agents, physical surveillance, telephone toll records and pen registers, trash searches, financial investigation, the grand jury, pole camera, and search warrants -- had failed, reasonably appeared unlikely to succeed if tried, or were too dangerous. (Hanson Aff. ¶¶69-80).

On March 12, 2004, the Honorable Nancy Gertner approved the government's application and issued an order authorizing the government to intercept communications over the Rivera cell phone for a period of 30 days (the "Wiretap Order" attached hereto as Exhibit 2). Judge Gertner made a specific finding that "normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if tried, or are too dangerous." (Wiretap Order at ¶6; see 18 U.S.C. § 2518(1)(c)). Judge Gertner also specifically found probable cause that the Rivera cell phone was being used by individuals named in the Wiretap Order, as well as by "others as yet unknown," to further drug trafficking and money laundering crimes. (Wiretap Order at ¶¶2-5).

## III. APPLICABLE LEGAL PRINCIPLES AND STANDARD OF REVIEW

To satisfy Title III's necessity requirement, a wiretap application must contain "a full and complete statement as to

11

whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The First Circuit has repeatedly "interpreted that provision to mean that the statement should demonstrate that the government has made 'a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to'" a wiretap. United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003) (quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)). The First Circuit has also emphasized that:

> the government does not need to exhaust all other investigative procedures before resorting to wiretapping. Nor must ordinary techniques be shown to have been wholly unsuccessful. Rather, the district court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence -- to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable.

United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir.) (citations omitted), cert. denied, 477 U.S. 908 (1986); Villarman-Oviedo, 325 F.3d at 9. Put another way:

> [a]n application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley. It is enough that reasonable efforts to succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression.

United States v. David, 940 F.2d 722, 729 (1ˢᵗ Cir.), cert. denied, 502 U.S. 989 (1991); United States v. Corrado, 227 F.3d 528, 539 (6ᵗʰ Cir. 2000) (holding that the purpose of section 2518(1)(c) "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques") (citation and internal quotation marks omitted).

A district judge who reviews a wiretap application in the first instance must not, the First Circuit has cautioned, apply a "rigid or rule-oriented" approach to the application's adequacy. David, 940 F.2d at 728. On the contrary, "'Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness.'" Id. (quoting United States v. Urib, 890 F.2d 554, 556 (1ˢᵗ Cir. 1989)). That is especially true where the wiretap investigation targets a drug organization: "[b]ecause drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some latitude in choosing their approaches." David, 940 at 728.

Once a wiretap has been duly authorized, a defendant challenging the wire bears the burden of showing that the authorization was not proper. United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 (10ᵗʰ Cir. 2002); United States v.

13

Torres, 908 F.2d 1417, 1422 (9th Cir. 1990) (defendant has burden of making a prima facie showing that the government failed to meet a condition precedent to issuance of wiretap).

A district judge asked to review *another* district judge's decision to approve a wiretap application has an even more limited role: "The reviewing court examines the face of the affidavit and 'decide[s] if the facts set forth in the application were *minimally adequate* to support the determination that was made.'" Villarman-Oviedo, 325 F.3d at 9 (emphasis added) (quoting United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989)). Thus, it is not the role of the reviewing judge to second-guess the issuing judge, or to ask whether he himself would have issued the warrant, but rather to determine if the issuing judge's decision was reasonable. See Lopez, 300 F.3d at 53.

As an initial matter, Reyes misapprehends the standard of review that Judge Gertner was required to apply to the government's application and that this Court is required to apply to Judge Gertner's determination. The question for Judge Gertner, was not, as Reyes seems to suggest, whether normal investigative procedures had proven wholly unsuccessful or had been completely exhausted, see Abou-Saada, 785 F.2d at 11, but simply whether, in light of the facts set forth in the Hanson Affidavit, electronic surveillance was "a suitable next step in a plausible progression" of investigative techniques, David, 940 F.2d at 729; see, e.g., United

14

States v. Cepeda, 2004 WL 912806, *2 (D. Mass. April 29, 2004).

Similarly, the question for this Court is only whether the facts in

the Hanson Affidavit were "minimally adequate" to support Judge

Gertner's determination.  Villarman-Oviedo, 325 F.3d at 9.

## II.  **Argument**

### A.  **The Facts Set Forth in the Hanson Affidavit Were More Than Minimally Adequate to Support The Court's Determination That Section 2518(1)(c)'S Requirement of Necessity Had Been Met.**

Applying these standards of review, there is no basis to

suppress the fruits of the wiretap. Reyes claims that the facts in

the Hanson Affidavit were not even minimally adequate to support

the determination by the Court (Gertner, J.) that "normal

investigative procedures have been tried and have failed,

reasonably appear unlikely to succeed if tried, or are too

dangerous."  Her argument boils down to an argument that law

enforcement's successes in making undercover purchases of heroin

from Rivera through her (Reyes) and co-defendant Arroyo vitiate any

necessity for a wiretap of the Rivera cell phone. (Reyes Mem., p.

4).  That is, the government had and could have achieved its

investigative goals by using (and continuing to use) normal

investigative means--here, controlled purchases of heroin-and,

therefore, Judge Gertner's decision to issue a wiretap warrant was

unreasonable.  Reyes further suggests that, given the agents'

success in the undercover purchases of heroin, necessity for a

wiretap would only exist if the goals of the investigation were so

15

impermissibly broad as to amount to "a general warrant to conduct an unlimited exploration investigation prohibited by the Fourth Amendment." (Reyes Mem., p. 4).

DEA TFA Hanson provided a detailed account of the progress of the investigation and investigation's successes in the Hanson Affidavit. He then set out the well-drawn goals of the ongoing investigation, Hanson Aff. ¶66, and discussed the ways in which those goals had not been met, Hanson Aff. ¶¶67, 69-80, contradicting Reyes' claim that the investigation's pre-wiretap successes forbade the issuance of a wiretap warrant or, alternatively, required that DEA continue pursuing the investigation through those same traditional means.    DEA TFA Hanson, specifically at Hanson Aff. ¶¶69-80 and throughout the Hanson Affidavit, explained in case-specific detail the reasons why previously-used normal investigative procedures were unlikely to achieve the investigation's remaining goals, and also why other normal investigative procedures were likely to fail or prove too dangerous.    These explanations were at the very least minimally adequate to support Judge Gertner's determination that the Order should issue.  By issuing the Order, Judge Gertner indicated his agreement with Task Force Agent's  assessment and decided that electronic surveillance was "a suitable next step in a plausible progression" of investigative steps.  David, supra, 940 F.2d at 729.  Accordingly, Reyes' motion should be denied.

16

At the time that the government sought authorization for the interception of the Rivera cell phone, the major goals of the investigation, as outlined in the Hanson Affidavit, were to: 1) infiltrate the upper echelon of Rivera's heroin distribution network, to determine the full extent of his current and historical drug trafficking and money laundering activities, and to confirm that Santiago was regular source of supply of heroin for Rivera; 2) identify whether Rivera had other sources of supply and determine who might be Rivera's transporters, managers, financiers, distributors and major customers; 3) determine when Rivera, Santiago, Reyes, Arroyo, Torrado and their as yet unidentified associates would be committed drug trafficking or money laundering crimes; 4) ascertain when these individuals and their associates stored and maintained their narcotics; and 5) determine the disposition of their drug proceeds and the location of any documents or records concerning their drug distribution.  (Hanson Aff. ¶66).  DEA Task Force Agent Hanson first noted that the agents involved in the investigation "had employed various investigative methods to try to accomplish these goals, but have had only limited success" and noted, "[f]or example, other than Rivera, I have not been able to identify other Santiago heroin customers; nor have I been able to identify Santiago's sources of supply; "I have not been able to determine whether Rivera has sources of supply other than Santiago" and that "[a]side from learning that Rivera conducts

17

a large portion of his banking transactions in case, I do not know how Rivera or any of the other Target Subjects transport, manage, store or dispose of their narcotics proceeds" (Hanson Aff. ¶67), before detailing the ways in which normal investigative techniques had failed, were too dangerous or were not likely to succeed in bring about the aims of the investigation. (Hanson Aff. ¶¶69-80). That discussion is summarized below:

        **1.** **Confidential sources**. As previously discussed, the agents received information from four confidential sources in this investigation. (Hanson Aff. ¶70). Although these sources had provided useful information in the course of the investigation that had been corroborated by other aspects of the investigation, the information they provided about the drug trafficking of the targets was limited. Moreover, CI-1, CI-3 and CI-4 were not willing to testify in court and CI-2 had been arrested after his cooperation with DEA and DEA would be reluctant to call him as a witness at trial. (Hanson Aff. ¶70). Even if all of the confidential informants had been willing and able to testify and cooperate proactively, they "would not be able to assist [DEA TFA Agent Hanson] in infiltrating the upper echelon of Rivera's heroin-trafficking organization." (Hanson Aff. ¶70). CI-3 had no relationship with Rivera and the other confidential informants would only be able to interact with Rivera as drug customers. Based upon DEA TFA Hanson's experience and as confirmed by the

18

experience of CI-2 as a drug customer of Rivera's for two years, Rivera would not (and did not) share information about the upper level of his organization or the scope of his drug dealing. Moreover, although CI-1 had provided some information about Santiago (Hanson Aff. ¶¶21-22), the agents had no confidential source in a position to make an introduction to Santiago. (Hanson Aff. ¶72).

**2. Use of Undercover Agents.** The Hanson Affidavit explicitly noted that "an undercover DEA agent already has infiltrated the Rivera organization." (Hanson Aff. ¶71). It noted, however, that although the UCA had successfully purchased heroin from two of Rivera's subordinates (Arroyo and Reyes), *the UCA had never met Rivera*. (Hanson Aff. ¶71). Even in the unlikely event that Rivera would deign to meet with the UCA, DEA TFA Hanson explained that all that the UCA would likely be able to do was purchase heroin from Rivera and that his status as a drug customer would be no greater than that of CI-1 or CI-2. (Hanson Aff. ¶71). As discussed in connection with the limitations of achieving the goals of the investigation through the confidential informants, based upon DEA TFA Hanson's experience, "mid-to high-level drug traffickers such as Rivera tend to deal only with individuals they know well and trust" and "they do not disclose the sort of information I am seeking about their operations to mere customers, especially those they have recently met." (Hanson Aff. ¶71). That is, even if

19

there had been additional UCA purchases of heroin from Rivera and even if DEA had chosen to pursue the February 12, 2004 negotiations for an additional purchase of heroin from Rivera (Hanson Aff. ¶¶10, 12), the UCA's status with Rivera would have remained as a drug customer who was unlikely to gain information about the scope and breadth of the drug operation.

Reyes' argument that the UCA purchases could have satisfied the goals of the investigation are also belied by the fact that, by the arrest of the defendants in October 2004, it was clear that the scop of the drug operation involved multiple customers and participants, at least one New York-based supplier and in excess of 1 kilogram of heroin whereas the UCA buys in December 2003 and January 2004 involved only one customer (UCA), involved only Rivera and his subordinates and a substantially smaller quantity of heroin.

Moreover, the agents had no confidential source who could introduce a UCA to Santiago. (Hanson Aff. ¶72). As discussed at length in regard to limits of the prior 1992 and 1996 investigations of Santiago (Hanson Aff. ¶¶59-64), agents had never been able to purchase heroin directly from Santiago (although they had been successful in buying heroin from Santiago's runner in 1993, Hanson Aff. ¶62) and Santiago's surveillance consciousness had made dealing with Santiago or his associates in this manner difficult (Hanson Aff. ¶64) and not feasible.

20

**3.    Physical Surveillance.**   The Hanson Affidavit also discussed the success of physical surveillance as well of the limitations of this traditional investigative technique. Physical surveillance had confirmed Rivera's connection to several locations; what were believed to be drug-related meetings between Rivera and Santiago; and the deliveries of heroin by Rivera's subordinates, Arroyo and Reyes. (Hanson Aff. ¶¶33-43, 73). The Hanson Affidavit discussed the limitations of physical surveillance since law enforcement could not maintain constant surveillance on Santiago, Rivera and their associates. (Hanson Aff. ¶73). Even if constant surveillance was possible, the agents had not yet identified Santiago's residence, thereby making it difficult to maintain surveillance. (Hanson Aff. ¶73).   Finally, physical surveillance on regular basis was risky because Rivera and Santiago were both surveillance conscious. (Hanson Aff. ¶73).   Santiago's surveillance consciousness was documented in previous investigations, (Hanson Aff. ¶¶64, 73), and the Hanson Affidavit also provided an example of Rivera's consciousness from December 10, 2003 surveillance in which agents were forced to discontinue surveillance of Rivera after he began driving in an erratic and evasive manner.  (Hanson Aff. ¶73).

**4.    Use of Telephone Toll Records and Pen Registers.**   As previously discussed, pen register data and toll records had revealed contact between the Rivera cell phone and telephones

21

associated with Santiago, Torrado, Arroyo and Reyes. (Hanson Aff. ¶74). Although this information was useful in corroborating the connections between Rivera and Reyes and Arroyo in connection with the UCA purchases of heroin and corroborating information from the confidential informants that Santiago was supplying heroin to Rivera, such information had significant limitations. (Hanson Aff. ¶¶12, 34-43, 73). The Hanson Affidavit explained these limitations: that the information did not identify the speakers; that the subscriber information for the involved telephones did not mean that the subscribers were the speakers; and, more importantly, this information did not reveal the contents of the calls and, therefore, did not allow the agents "to identify with certainty the persons involved in the conversations or the significance of the communications in the context of ongoing narcotics trafficking and money laundering activity." (Hanson Aff. ¶74).

5. **Trash Searches.** On two separate occasions, agents had conducted trash searches of Rivera's trash and these searches had resulted in seizure of what was believed to be a drug ledger, phone bill for the Rivera cell phone and bank records that led to identification of Rivera's bank account. (Hanson Aff. ¶¶45, 75). No such search of Santiago's trash was feasible since the agents did not, at the time, know where Santiago resided or where he disposed of his trash. (Hanson Aff. ¶75). DEA TFA Hanson explained that even if it was feasible to search the trash of all

22

the targets, based upon his training and experience,[8] he doubted that trash would produce evidence sufficient to accomplish all of the stated goals of the investigation. (Hanson Aff. ¶75). The discovery of these items in Rivera's trash, for example, would not have served to infiltrate the upper echelon of the drug network nor would it have identified the scope of that network.

**6. Financial Investigation.** The agents had begun and was continuing a financial investigation of Rivera at the time of the application to intercept the Rivera cell phone. (Hanson Aff. ¶76). Although this investigation revealed that Rivera regularly deposited and withdrew substantial amounts of case above and beyond his known, legitimate source of income, DEA TFA Hanson explained that it was not sufficient to accomplish the goals of this

_____

[8]As stated in the Hanson Affidavit, DEA TFA Hanson was an experienced law enforcement agent who was well-versed in the investigation of narcotics trafficking. (Hanson Aff. ¶¶2-3). Specifically, DEA TFA Hanson had received specialized training regarding the activities of narcotics traffickers and had participated in numerous narcotics investigations as a case agent and in a subsidiary role. Id. He also had personally participated in almost all aspects of narcotics trafficking investigations. (Hanson Aff. ¶3). Based on this training and experience, the agent was familiar with narcotics traffickers' methods of operation. Id. Additionally, as the case agent for this investigation, DEA TFA Hanson was familiar with the various aspects of the investigation. (Hanson Aff. ¶6).

Accordingly, DEA TFA Hanson's experienced opinion provided the Court with an additional basis to conclude that the wiretaps in this case were necessary. See Ashley, 876 F.2d at 1072 ("issuing court may properly take into account affirmations which are founded in part upon the experience of specially trained agents") (citations omitted).

23

investigation.  (Hanson Aff. ¶76).  Morever, the discovery of what
was believed to be drug ledger in the trash search and substantial
cash deposits in Rivera's bank accounts (Hanson Aff. ¶¶44-45)
suggest that the drug operation was a cash business, the full scope
of which would not have been revealed by a financial investigation
for bank records and the like.

**7.  Use of the Grand Jury.**  The agents had obtained and used
grand jury subpoenas to obtain telephone records and financial
information.  (Hanson Aff. ¶77).  Based upon the affiant's training
and experience and consultation with other experienced agents and
federal prosecutors, DEA reasonably believed that subpoenaing the
targets or their associates would not achieve goals as they would
most likely be uncooperative and/or invoke their 5th Amendment right
not testify.  The choice whether to immunize such witnesses would
not be informed at this point in the investigation since immunizing
such individuals might foreclose prosecution of the most culpable
individuals and would not ensure that the witnesses would provide
truthful information.  (Hanson Aff. ¶77).  Moreover, the issuance
of such subpoenas would alert participants in the drug operation to
the fact of the investigation and might cause them to be more
cautious in their criminal conduct, flee, destroy or conceal
evidence or otherwise compromise the investigation.  (Hanson Aff.
¶78).

**8.  Use of Pole Camera.**  As previously recounted, a pole

24

camera fixed on the parking lot at Old English Village, Rivera's residence, was installed in December 2003, but due to technical difficulties did not record and was removed in February 2004. (Hanson Aff. ¶79). Given this malfunction, use of same did not achieve goals of the investigation. Even if it had not malfunctioned, a pole camera in the single location of Old English Village or in any one location would not have revealed the scope of the drug business as it operated in numerous locations (e.g., locale of UCA buys arranged with Rivera; or residence or location associated with Santiago, that as of application for interception of Rivera cell phone, had not yet been identified).

**9.   Search Warrants**.  The Hanson Affidavit made clear that search warrants would undoubtedly be used at the end of the investigation (as indeed they were on October 15, 2004 in connection with the arrests of the defendants), but it would be premature and unfruitful to do so at the time of the application for the interception of the Rivera cell phone. (Hanson Aff. ¶80). Use of this investigative technique would be premature because the agents had not been able to obtain sufficient information about the places where the targets stored their drugs and related items. (Hanson Aff. ¶80). Execution of search warrants, even in connection with other normal investigative means, would not have been likely to reveal the identity of all of Rivera's and Santiago's associates, suppliers, financiers, distributors, and

25

major customers, their methods of operation, their money laundering activities, and the date, time and place of planned drug deals. (Hanson Aff. ¶80). Morever, the execution of search warrants would alert the targets to the existence of an ongoing investigation which would have the likely disastrous effect of causing them to be more cautious, flee, destroy or conceal evidence or otherwise compromise the investigation. (Hanson Aff. ¶80). DEA TFA Hanson further noted that the execution of search warrant on Rivera's Old English Village residence at the time of the wiretap application was not advisable given the historical information that, at least as of October 2003 and then November 2003 from CI-2 (Hanson Aff. ¶¶25-26), Rivera maintained a stash location elsewhere, changed this location and the fact Rivera had been recently ordered to vacate that residence as a result of a domestic retraining order in February 2004.

Accordingly, the Hanson Affidavit discussed the relative success and failure of the traditional investigative techniques that had been tried in the investigation, and an explanation regarding why other procedures reasonably appeared unlikely to succeed if tried or to be too dangerous.

**2.  The Goals of the Investigation Were Reasonable Drawn and the Authorization of the Interception of the Rivera Cell Phone Did   Not Amount to An Impermissible "General Warrant"**

Moreover, the government's stated goals of the investigation

26

were reasonable and permissible under the law. To be sure, the
government cannot simply set investigative goals that by their very
nature are designed to bypass normal tools of investigation in
favor electronic surveillance. See United States v. Blackmon, 273
F.3d 1204, 1211 (9th Cir. 2001) (noting that "[t}he government may
not cast its investigative net so far and so wide as to manufacture
necessity in all circumstances"). However, the goals of the
Martinez investigation were neither impossibly broad nor
unrealistic.

The fact remains that the major goals of the investigation
were legitimate goals, even if they are often the legitimate goals
of other investigations of a drug trafficking conspiracy. See,
e.g., United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir.
2002) (wiretap necessary to identify "conspiracy's members and the
supplier of its drugs," as well as to reveal "organizational
structure of the drug conspiracy"); Lopez, 300 F.3d at 53-54
(necessity established where traditional methods failed to
establish the identity of some conspirators, particularly those at
top, and cooperating sources had limited information concerning
"full scope of the conspiracy"); United States v. Garcia, 232 F.3d
1309, 1316 (10th Cir. 2001) ("wiretaps were necessary to reveal the
full scope the conspiracy and to identify [the defendant's]
suppliers"). The Hanson Affidavit in this case did not contain
"boilerplate assertions [that] are unsupported by specific facts

27

relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations." Blackmon, 273 at 1210.

Even assuming *arguendo* that it were true that the goals of the investigation *might* have been achieved by use of normal investigative means, that does not make them impermissible. Title III only requires that the government set forth what efforts it has taken (or considered taking) in achieving the goals of its investigation, and explain why those efforts have failed or are reasonably unlikely to succeed. See, e.g., United States v. Castillo-Garcia, 117 F.3d 1179, 1187 (10th Cir. 1997) ("the government may obtain a wiretapping warrant without trying *any* other method of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try") (citations omitted) (emphasis in original); Ramirez-Encarnacion, 291 F.3d at 1222, n. 1 (overruling Castillo-Garcia only to the extent that it had ruled on the standard of review on appeal). Accordingly, the stated goals of the investigation were not so broad that they amounted to a "general warrant," as argued by Reyes.

## V.    Conclusion

The Hanson Affidavit contained at least minimally adequate facts from which Judge Gertner could reasonably conclude that electronic   surveillance   was   a   suitable   next   step   in   an

28

investigation that had achieved some successes but that had also come up short in important areas.   Reyes' motion to suppress evidence collected pursuant to that authorized electronic surveillance must therefore be denied.   For all of the aforementioned reasons, the government respectfully submits that the Court deny this motion on the pleadings and that no hearing is necessary.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   DENISE JEFFERSON CASPER
Assistant U.S. Attorney

Dated: June 6, 2005

### CERTIFICATE OF SERVICE

This is to certify that I have this day served upon counsel of record in the captioned matter a copy of the foregoing document by electronic filing and depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery.

This 6th day of June, 2005.

DENISE JEFFERSON CASPER
ASSISTANT UNITED STATES ATTORNEY

29