UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | $04$MBD $10073$ |
| OF THE UNITED STATES OF AMERICA ) | |
| FOR AN ORDER AUTHORIZING INITIAL ) | |
| INTERCEPTION OF WIRE COMMUNICATIONS ) | M.B.D. NO.: |
| MADE OVER THE CELLULAR TELEPHONE ) | |
| BEARING INTERNATIONAL MOBILE ) | |
| SUBSCRIBER NUMBER (IMSI) ) | **FILED UNDER SEAL** |
| 316010005444317, AND URBAN FLEET ) | |
| MOBILE IDENTIFIER (UFMI) NUMBER ) | |
| 180*11*57720 6 AND CURRENTLY ) | |
| ASSIGNED TELEPHONE NUMBER ) | |
| 978-423-8173 ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR
## AUTHORIZATION TO INTERCEPT WIRE COMMUNICATIONS

I, **TERRY G. HANSON**, a Task Force Agent with the United

States Drug Enforcement Administration ("DEA"), being duly sworn,

hereby depose and state as follows:

I.   **INTRODUCTION**

A.   **Agent's Background**

1.   I am an "investigative or law enforcement officer of

the United States" within the meaning of Section 2510(7) of Title

18, United States Code, that is, an officer of the United States

who is empowered by law to conduct investigations of, and to make

arrests for, offenses enumerated in Section 2516, Title 18,

United States Code.  I have been employed as a Task Force Agent

of the United States Drug Enforcement Administration ("DEA")

since 1999.  I am also a sergeant with the Massachusetts State

Police, with whom I have been employed since December 1985.

17

2.    During my employment with the State Police and DEA, I
have participated in numerous investigations relating to the
distribution of controlled substances, including cocaine, heroin,
and other substances in violation of the federal and state anti-
drug laws, including Title 21, United States Code, Sections
841(a)(1) and 846.  I have received training in the field of
narcotics enforcement and investigations.  I am familiar with the
habits, methods, routines, practices and procedures commonly
employed by persons engaged in the trafficking of illegal drugs.
I have been the affiant on numerous affidavits in support of
arrest warrants and other applications.  I also have a Bachelor
of Arts degree and a Master's degree in criminal justice.

3.    In addition to my training, I have had extensive
experience in the investigation of drug traffickers, including
the debriefing of numerous defendants, informants, and witnesses
who had personal knowledge about drug trafficking activities and
the operation of drug trafficking organizations.  I have
participated in almost all aspects of drug trafficking
investigations, including but not limited to conducting
surveillance, acting in undercover capacities, using confidential
informants, and conducting court-authorized wire and electronic
surveillance.  Through my training, education and experience, I
have become familiar with the manner in which illegal narcotics
are transported, stored, and distributed, and with the methods of

payment for such drugs. I am familiar with the manner in which
drug traffickers use vehicles, common carriers, mail and private
delivery services, and a variety of other means to transport and
distribute drugs and the proceeds of drug trafficking. I also am
familiar with the manner in which drug traffickers use
telephones, coded telephone conversations, pagers, coded pager
messages, and other means to facilitate their illegal activities.

## B.   Purpose of Affidavit

4.    I submit this Affidavit in support of an Application
for an Order pursuant to Section 2518 of Title 18, United States
Code, authorizing the interception and recording of wire
communications (including voice mail messages, and interception
of "direct connect" conversations) occurring over the cellular
telephone assigned number 978-423-8173, bearing international
mobile subscriber identity ("IMSI") 316010005444317, and urban
fleet mobile identifier (UFMI) number 180*11*57720, which is a
Nextel telephone, subscribed to by Reynaldo Rivera, 235 18th
Street, Apt. 204, Dracut, Massachusetts ("Target Telephone"), and
any subsequently changed telephone numbers assigned to the
instrument bearing the same IMSI,[1] or any changed IMSI assigned
to the same telephone number, concerning certain offenses

---

[1]    The IMSI number is encoded on a computer chip which can
be inserted into and utilized by any telephone programmed
similarly to the Target Telephone. However, the IMSI number is
unique to the subscriber of the Target Telephone.

3

enumerated in Section 2516 of Title 18, United States Code, to wit: offenses involving the distribution of (and possession with intent to distribute) controlled substances; the use of wire facilities to facilitate the same; conspiracy to do the same, and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843(b) and 846; and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957.[2]

5.    I believe that there is probable cause to believe that these offenses have been committed, are being committed, and will continue to be committed by persons who are the subjects of this investigation, including, among others, Reynaldo Rivera, a/k/a "Rey" ("RIVERA"); Julio SANTIAGO, a/k/a "Macho ("SANTIAGO"); Jose TORRADO ("TORRADO"); Zuleima REYES ("REYES"); Santiago Arroyo ("ARROYO"), and others as yet unidentified (collectively "Target Subjects"). The requested order is sought for a period of time until the requested interceptions fully reveal the identity of and manner in which the Target Subjects engage in the above-described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code, Section 2518(5). Pursuant to Section 2518(5) of Title 18, United

---

[2]    Although not a predicate offense under 18 U.S.C. § 2516, there is probable cause to believe that the subjects of this investigation have aided and abetted and are aiding and abetting these substantive offenses, in violation of 18 U.S.C. § 2.

4

20

States Code, it is further requested that the 30-day period be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order, or ten days from the date of this Court's Order. It is further requested that the thirty (30) day period be counted in 24-hour intervals from the time investigative or law enforcement officers first begin conducting interceptions pursuant to the Order.

6.     This case is being investigated by DEA, the Massachusetts State Police, the Lowell Police Department, and the Dracut Police Department. I have personally participated in the investigation of the offenses referred to in ¶ 4 above, and make this Affidavit based on my personal participation in this investigation, and based on written and oral reports made to me by other agents and law enforcement authorities. Except where otherwise noted, the information set forth in this Affidavit has been provided to me by other law enforcement agents who have assisted in the investigation. Information resulting from surveillance sets forth either my personal observations or information provided directly or indirectly by other law enforcement officers who conducted such surveillance.

## II.   PRIOR APPLICATIONS

7.     On or about February 6, 2004, searches were conducted of the oral, wire, and electronic surveillance indices of the

5

21

DEA, FBI, and the United States Immigration and Customs Enforcement. The indices show that there are no prior applications for Court orders authorizing the interception of wire, oral or electronic communications involving any of the same persons, communication facilities or places specified in the wiretap application.

## III. PROBABLE CAUSE

### A. The Target Subjects

8. The following biographical information was assembled from telephone toll records, information from public documents on file at the United States Immigration and Customs Enforcement, the Commonwealth of Massachusetts Secretary of State, the Massachusetts Registry of Motor Vehicles, and from other public and business records.

### 1. Reynaldo Rivera, a/k/a "Rey"

9. Reynaldo RIVERA is a 25 year old Hispanic male who, between March, 2003 and February 17, 2004, resided at 235 18th Street, Apartment 204 in Dracut, Massachusetts.[3] Two different

---

[3] This address is located inside building #2 of the Old English Village apartment complex (hereinafter "Old English Village" or "Building #2"). Old English Village is a sprawling complex, with multiple sections. Building #2 is in a section located on 18th Street that contains three, three-story, multi-family residential buildings. Building #2 is in the middle of these three buildings.

On February 17, 2004, RIVERA was evicted from his apartment at Old English Village by the Dracut Police Department, (continued...)

6

22

previously reliable confidential informants have identified RIVERA as a major heroin trafficker. One of these informants also identified Julio SANTIAGO (discussed below) as RIVERA's source of heroin. As discussed in greater detail in the "Probable Cause" section below, between July 2003 and February 2004, RIVERA and SANTIAGO were observed on several occasions, by a third confidential informant, and by law enforcement, engaging in what appeared to be drug-related transactions in the parking lot outside of RIVERA's residence at Old English Village. The most recent of these meetings occurred on February 12, 2004.

10. RIVERA is the subscriber to the Target Telephone and appears to be the primary, if not the exclusive, user of the phone. Based on my investigation, I believe that RIVERA has been using the Target Telephone to facilitate his heroin trafficking. For example, as discussed in detail below, among other things, on on January 14, 2004, and February 12, 2004, RIVERA used the Target Telephone to participate in a conference call with an undercover agent and one of RIVERA's drug associates, Target Subject Zuleima REYES. During each of these tape recorded calls, RIVERA agreed to lower the price of the heroin that the

---

³    (...continued)
pursuant to a civil restraining order obtained by his girlfriend, Janice PEREZ, who was living with RIVERA inside the apartment. RIVERA told the police officers effecting the restraining order that he thereafter would be staying at his father's residence at 15 Madonna Circle in Lowell. He also provided the Target Telephone as the phone number where he could be reached.

undercover agent was buying from REYES, but only on the condition

that the agent purchase large quantities such as eight (8) or

nine (9) ten-gram "fingers" at a time. RIVERA does not have any

criminal convictions.

### 2.    Julio Santiago, a/k/a "Macho"

11.    Julio SANTIAGO is a 45 year old Hispanic male. As

mentioned above, and discussed in more detail below, I believe

that SANTIAGO is RIVERA's main source of heroin. SANTIAGO drives

a blue 1994 Plymouth Voyager minivan bearing Massachusetts

license plate registration 5133XA, which is registered under

SANTIAGO's name, at 28 Clark Rd, Shirley, Massachusetts

(hereinafter "the SANTIAGO minivan"). Based on reliable

confidential informant information that has been corroborated, I

believe that SANTIAGO uses a cellular telephone with the New York

City area number 347-200-5004, which is subscribed to by Debra

Diaz at 7612 5th Avenue, Apartment 3, Brooklyn, New York

(hereinafter "the SANTIAGO cell phone").[4] Pen register data

shows frequent contact between the Target Telephone and the

SANTIAGO cell phone, as well as mutual contact between these two

phones and certain telephones used by another Target Subject,

---

[4]       This telephone number was provided to the Lowell
Police, in August of 2003, by a previously reliable confidential
informant who wishes to remain anonymous (hereinafter "CI-4").
This is the only piece of information this individual has
provided in this investigation. CI-4 does not have a criminal
record, and has not received any promises, rewards, or
inducements for this information.

8

24

Jose TORRADO. Based on the surveillance conducted in this case, and information from reliable confidential informants, I believe that some, if not all, of these contacts are drug related.

12. For example, on February 12, 2003, almost immediately after RIVERA engaged in one of the above-referenced conference calls with the undercover agent (during which RIVERA agreed to sell the undercover eight (8) ten-gram fingers of heroin at $850 per finger), there was an outgoing call from the Target Telephone to the SANTIAGO cell phone that lasted 45 seconds. Approximately one hour later, SANTIAGO was observed driving the SANTIAGO minivan to the parking lot of Old English Village, where he and RIVERA were videotaped while they engaged in an apparent drug transaction that lasted two minutes, after which SANTIAGO departed in his minivan. Pen register data shows that the SANTIAGO cell phone placed a 15-second call to the Target Telephone shortly before SANTIAGO arrived for this meeting, and that the Target Telephone placed a 39-second call to the SANTIAGO cell phone shortly after SANTIAGO left the meeting. Within two minutes after the meeting, the Target Telephone placed a 35-second call to the cell phone being used by Target Subject Zuleima REYES, from whom the undercover agent already had purchased close to 100 grams of heroin. Although Santiago has been the target of two prior DEA drug investigations, he has no prior drug arrests or convictions.

9

25

### 3.   Zuleima Reyes

13.   Zuleima REYES is a 23 year old Hispanic female with no prior criminal convictions.   REYES drives a green Dodge Stratus bearing Massachusetts license plate registration 87EA40, which is registered to REYES at 19 Conlon Terrace, Lowell, Massachusetts, an address she shares with her mother, Ramonita Cedeno.   REYES appears to be RIVERA's primary drug associate.   As discussed more fully below, on December 18, 2003, and January 7 and 14, 2004, REYES distributed a total of approximately 96 grams of heroin to an undercover agent.   REYES also facilitated the two conference calls with RIVERA and the undercover, which are summarized above and described more fully below.   Pen register data shows extensive contact between the Target Telephone and the cellular telephone that the undercover agent uses to contact REYES.

### 4.   Jose Torrado

14.   Jose TORRADO is a 23 year old Hispanic male with no prior criminal convictions.   A reliable confidential informant has identified TORRADO as one of RIVERA's drug associates.   This same informant reported that in November 2003, TORRADO and the confidential informant were both present inside one of RIVERA's "stash" houses, where the informant observed over 90 grams of heroin, packaged in 10-gram "fingers."   TORRADO drives a 2004 Toyota Matrix bearing Massachusetts license plate registration 4985YL, which is registered to Reynaldo RIVERA at 235 18th

10

26

Street, #204, Dracut, Massachusetts. TORRADO has four different cellular telephones that are subscribed to in his name at 4 Florence Street in Lowell: 978-479-0764, 978-479-1192, 978-479-8210, and 978-479-8922. Pen register data and toll records show an aggregate total of 684 contacts between the Target Telephone and these four TORRADO cell phones between November 7, 2003 and February 23, 2004.[5] Pen register data also shows a total of 65 contacts between a cellular telephone utilized by Julio SANTIAGO (which is described below) and one of the TORRADO cell phones (978-479-8210) between January 6 and February 23, 2004.

### 5. Santiago Arroyo

15. Santiago ARROYO is a 20 year old Hispanic male with no prior criminal convictions. ARROYO drives a blue Chevrolet Cavalier bearing Massachusetts license plate registration 1641SJ, which is registered in ARROYO's name at 1016 Middlesex Street, Apt. A1, Lowell, Massachusetts, an address which a previously reliable confidential informant identified as a former RIVERA "stash" house. A confidential informant has identified ARROYO as a "runner" for RIVERA. On December 10, 2003, ARROYO delivered 10 grams of heroin to an undercover agent, after the agent had negotiated the transaction with RIVERA over a cellular telephone

---

[5] With respect to all date ranges listed in this affidavit relating to telephonic contact among the Target Subjects, the first date in the range represents the first contact, and the second date in the range represents the most recent contact.

11

later utilized by Zuleima REYES.

**B.    Overview of the Investigation**

16.    Based on the investigation to date, I have determined
that RIVERA is one of the largest heroin dealers in the Lowell
area.   Based on physical surveillance by agents, information
received from reliable confidential informants, undercover
purchases of heroin, and trash searches, among other things, I
believe that RIVERA is actively conspiring with the other Target
Subjects -- SANTIAGO, REYES, TORRADO, ARROYO, and unknown others,
to distribute large quantities of heroin in and around Lowell.
However, I have thus far been unable to determine the full scope
of RIVERA's drug business, to determine the full scope of
SANTIAGO's involvement in RIVERA's organization, and to gather
enough evidence to fully dismantle the drug cell described in
this affidavit.   To accomplish these goals, I believe that a
wiretap is necessary.

**C.    Facts and Circumstances**

**1.    Kevin Rosas Investigation**

17.    In March 2003, I commenced an undercover investigation
of a Lowell-based heroin dealer named Kevin Rosas ("ROSAS"),
based on information from a reliable confidential informant that
ROSAS was distributing gram-amounts of heroin in the Lowell area.
After being introduced to ROSAS in March, 2003, I personally made
four undercover purchases of heroin from ROSAS, totaling 134.6

12

grams.   During one of the four controlled purchases, ROSAS told me, in a consensually-recorded conversation, that he had three different sources of supply for heroin.  ROSAS said that two of his sources supplied him with "fingers" while the third supplied loose powder. In connection with controlled purchases made on April 18 and May 1, 2003, RIVERA was observed meeting with ROSAS just prior to ROSAS delivering "fingers" of heroin to me.[6]  On each occasion, RIVERA was observed operating a black 1999 GMC Yukon with a Massachusetts license number 4740YR, registered to him at 235 18th Street, Apt. 204, Dracut, Massachusetts.  Based on these observations, I believe that RIVERA supplied ROSAS with the heroin ROSAS sold to me on April 18 and May 1.

18.    On May 30, 2003, I seized an additional 122.4 grams of heroin from ROSAS before arresting him.  That same day, ROSAS was charged by complaint in the U.S. District Court for the District of Massachusetts with distribution of heroin.  On December 18, 2003, ROSAS pleaded guilty to a six-count indictment charging him with distribution of heroin, in violation of Title

---

[6]    Toll records indicate that ROSAS was in telephonic contact with RIVERA on both days.  Specifically, on April 18, 2003, at 12:30 p.m., ROSAS (978-265-7573) placed an outgoing call to the Target Telephone lasting less than one minute.  Within thirty minutes, law enforcement observed RIVERA meeting with ROSAS outside of ROSAS' residence.  Similarly, on May 1, 2003, at 10:30 a.m., ROSAS (978-265-7573) placed an outgoing call to the Target Telephone lasting less than one minute.  At about 12:50 p.m., law enforcement observed RIVERA meeting with ROSAS outside of ROSAS' residence.

13

29

21, United States Code, Section 841(a)(1), and conspiracy to distribute heroin, in violation of Title 21, United States Code, Section 846. After ROSAS' arrest, I began in earnest to investigate RIVERA.[7]

### 2.    Reynaldo Rivera Investigation

19. In addition to RIVERA's involvement with ROSAS on April 18 and May 1, 2003, the investigation has revealed substantial evidence that Julio SANTIAGO supplies large amounts of heroin to RIVERA on a weekly basis; that RIVERA, in turn, supplies large amounts of heroin to others in the Lowell area; that RIVERA employs others in this enterprise; and that RIVERA uses the Target Telephone to coordinate all of this illegal activity. As discussed below, my conclusions are based on, among other things, information provided by three reliable confidential informants of the Lowell Police Department (hereinafter "CI-1," "CI-2," and "CI-4,") and a concerned citizen ("CI-3"),[8] physical surveillance, analysis of toll records and pen register information, trash

---

[7]    ROSAS is scheduled for sentencing on April 8, 2004. Although he is facing a ten-year minimum mandatory sentence, ROSAS has not proffered any evidence to the government about the events described above, nor has he indicated a desire to cooperate.

[8]    To protect the identities of unidentified cooperating individuals, such as confidential informants who are not willing to testify ("CI'S") or cooperating witnesses ("CW's"), the masculine pronouns "he," "him," and "his," will be used throughout this affidavit to describe them. This does not mean, however, that the referenced individual is necessarily male.

14

searches, controlled purchases from two of RIVERA's drug associates, and interviews of drug users who were arrested after they purchased heroin from Zuleima REYES and Jose TORRADO.

### a. Information from CI-1

20. CI-1 has been providing information to the Lowell Police Department since 2002.[9] The information provided by CI-1 has consistently proven to be accurate and reliable, and has resulted in the arrest and successful state prosecution of three individuals for narcotics violations. In addition, much of the information CI-1 has provided relative to this investigation has been corroborated by information provided by other informants, physical surveillance, and pen register and toll records data. CI-1 does not receive any promises, rewards, or inducements for his cooperation.

21. According to CI-1, RIVERA is one of the largest heroin distributors in Lowell. CI-1 stated that RIVERA has numerous drug associates, and identified Kevin ROSAS (who, as discussed above, pleaded guilty to distributing over 100 grams of heroin to me in March, April, and May 2003), and Target Subject Jose TORRADO as persons who either worked for RIVERA or purchased heroin from him. CI-1 correctly identified TORRADO's vehicle as

---

[9] CI-1 has numerous criminal convictions for a variety of crimes, including operating to endanger, leaving the scene of an accident, threatening, assault & battery, receipt of stolen property, and breaking & entering.

15

a silver Toyota Matrix with Massachusetts license plate number
4985YL (which, as discussed above, is registered to RIVERA at the
235 18th Street address).

22.  According to CI-1, RIVERA is supplied heroin by Julio
SANTIAGO, a large-scale heroin and cocaine distributor who owns
several properties in Lowell.  CI-1 advised that SANTIAGO
typically changes his cellular telephone often and is always very
careful and surveillance-conscious when conducting his drug
business.  CI-1 stated that SANTIAGO drives several different
vehicles, including a blue minivan, a gold Nissan Maxima, and a
red Mini Cooper.

            b.    Information from CI-2

23.  CI-2 has been providing information to the DEA, as well
as to the Lowell Police Department and the Bureau of Alcohol,
Tobacco and Firearms, since August 13, 2003.[10]  Information
provided by CI-2 has consistently been accurate and reliable, and
has resulted in the arrest of five individuals for narcotics and
firearms violations.  In addition, much of the information CI-2
has provided relative to this investigation has been corroborated
by information provided by other informants, physical
surveillance, and pen register and toll records data.  CI-2
initially was to be paid for the information he provided about

_____

      [10]   CI-2 has at least five, separate criminal convictions
involving the distribution of cocaine and heroin.

                            16

                                                            32

RIVERA. However, he has never been paid for his services, although he continued to provide useful information up until January 2004.

24. According to CI-2, RIVERA is one of the largest heroin dealers in Lowell. CI-2 has informed me that: RIVERA supplies heroin to several mid-level distributors, who, in turn, supply lower level dealers, who themselves supply the street-level dealers; RIVERA is capable of selling multiple ounces of heroin; CI-2 purchased heroin from RIVERA on numerous occasions over a two-year period dating back to 2001; RIVERA used to deliver the heroin to CI-2 in a black GMC Yukon;[11] RIVERA had always been able to supply any amount of heroin that CI-2 ordered; CI-2 has purchased as much as 50 grams of heroin at a time from RIVERA; as of September 2003, RIVERA would not sell less than five grams of heroin at a time; as of November 2003, RIVERA had increased his minimum to 10 grams; and since January, 2004 RIVERA has been distributing in excess of 100 grams of heroin every two days.

25. In November 2003, CI-2 reported that he had been inside RIVERA's "stash house," where RIVERA was storing and processing his heroin. CI-2 stated that the stash house was located inside

---

[11]     As discussed in ¶ 17 above, RIVERA used this same vehicle to deliver heroin "fingers" to Kevin ROSAS on April 18 and May 1, 2003.

17

33

a second-floor apartment at 1016 Middlesex Street in Lowell.[12]
While inside the apartment, CI-2 saw in excess of 90 grams of
heroin, packaged in 10-gram "fingers." Also present was a slim
Hispanic male who CI-2 has seen operating a "gray van" with
Massachusetts license plate number 4985YL. As noted above in ¶¶
14 and 19 above, this license plate belongs to the silver Toyota
Matrix that is registered to RIVERA and driven by Jose TORRADO.
CI-2 further stated that RIVERA employs a runner named
"Santiago," who CI-2 subsequently identified as Santiago ARROYO
("ARROYO"). CI-2 said that ARROYO was using cellular telephone
number 978-479-0764 (one of the four TORRADO cell phones).
Accordingly, I showed CI-2 a picture of Jose TORRADO, and he
identified TORRADO as the Hispanic male he had seen inside the
1016 Middlesex Street stash house. On October 6, 2003,
surveillance agents followed RIVERA to this stash house directly
from the Jeanne D'Arc Credit Union on Merrimack Street in Lowell,
where RIVERA banks.

    26. On December 10, 2003, CI-2 reported that RIVERA had
changed his "stash" location to Room 121 at the Motel 6 on Route
38 in Tewksbury, Massachusetts. CI-2 stated that he had been
inside the hotel room in early December, and at that time he saw
a large amount of heroin in the room. CI-2 stated that one of

---

        [12]    As discussed in ¶ 15 above, Santiago ARROYO provided
this address to RMV as his home address.

RIVERA's girlfriends was now assisting him in his heroin distribution, and that she was also present in the hotel room when CI-2 was there. CI-2 described the female as young, short, chubby, with brown hair. Although this description is an accurate description of Zuleima REYES, I have not yet positively identified this female. On December 16, 2003 I went to the Motel 6 on Route 38 in Tewksbury and requested a copy of the registration card for Room 121 for December 10, 2003. The manager of the Motel 6 provided a copy of the registration card, which revealed that the room had been rented by Zuleima REYES of 19 Conlon Terrace in Lowell.

###         c.    Information from CI-3

27.  On July 15, 2003, an individual who lives at Old English Village contacted the Dracut Police Department to complain about what he believed to be drug transactions occurring in the parking lot of the apartment complex (hereinafter "CI-3"). CI-3 is a concerned citizen who was merely reporting suspicious activities.  CI-3 does not have a criminal record, and has not asked for, nor received, any promises, rewards, or inducements for his cooperation, although, on February 2, 2004, CI-3 was paid $500 for expenses relating to the operation of a pole camera (discussed below in the "Necessity" section).  I deem the information CI-3 has provided to be reliable, because this information has been corroborated by other aspects of the

19

35

investigation. 

28.   Beginning in July 2003, CI-3 began to observe a series
of transactions occurring in a corner of the Old English Village
parking lot near the woods.  CI-3 has observed many of these
transactions, all of which have occurred in the same manner.
Specifically, a vehicle would drive into the parking lot,
whereupon the driver would back the car into the corner of the
parking lot near the woods.  Shortly thereafter, an Hispanic male
would exit Building #2 and walk over to the waiting vehicle.
After an apparent exchange with the occupant(s) of the vehicle,
the Hispanic male would return directly into Building #2.  The
vehicle would then leave the parking lot.  CI-3 stated that he
had witnessed many such meetings before complaining about it to
the Dracut Police Department in July, 2003.

29.   CI-3 described the Hispanic male from Building #2 as a
heavyset Hispanic male with short dark hair and dark skin, who
occasionally wears glasses.  Based on this description, I showed
CI-3 a picture of RIVERA, and CI-3 immediately identified RIVERA
as the Hispanic male from Building #2.  CI-3 stated that in
addition to having seen RIVERA during the transactions described
above, CI-3 also often saw RIVERA in the parking lot at Old

20

36

English Village, sitting inside of, and working on, a black GMC
Yukon with Massachusetts license plate number 4740XR (i.e., the
same vehicle RIVERA was driving when he met with Kevin ROSAS in
April and May 2003). CI-3 also has observed RIVERA conduct
apparent drug transactions while RIVERA was working on his black
Yukon in the parking lot. On those occasions, CI-3 would observe
another vehicle pull into the parking lot, whereupon RIVERA would
walk over to the vehicle and engage in a transaction similar to
that described above.

30. CI-3 stated that he had seen RIVERA conduct the above-
described transactions most frequently with the occupant of a
blue minivan bearing Massachusetts license plate registration
5133XA (i.e., the SANTIAGO minivan). CI-3 stated that this
minivan typically arrived between 10:00 a.m. and 2:00 p.m.,
whereas the other vehicles would arrive at anytime throughout the
day and into the early evening.[13]

### d. Pen registers and toll records

31. On October 10, 2003, I received court authorization to
use a pen register and trap and trace device to monitor the
telephone activity over the Target Telephone. The pen register

---

[13]    An analysis of the pen register data for the Target
Telephone reveals that between November 7, 2003 and February 16,
2004, there were a total of 57 contacts between the Target
Telephone and the SANTIAGO cell phone. The majority of the calls
(32) were made between 11:00 a.m. and 2:00 p.m.

21

on this phone, combined with the other investigative techniques used in this investigation, indicate that RIVERA is using the phone to discuss and coordinate narcotics trafficking with the other Target Subjects.

32.   Pen register data reveals a great deal of contact between the Target Telephone and other telephones utilized by the Target Subjects. For example, between November 7, 2003 and February 23, 2004, there were 57 contacts with the SANTIAGO cell phone; 765 contacts with two cellular telephones utilized by Zuleima REYES (978-726-3971 and 978-729-9490); and 215 contacts with two cellular telephones utilized by Santiago ARROYO (978-479-0764 and 978-726-2612). As discussed below, both REYES and ARROYO sold heroin to an undercover agent in transactions that were coordinated by RIVERA, and REYES used one of the two above-described cellular telephones to communicate with the undercover agent in the course of the three transactions in which she was involved and to arrange two conference calls with RIVERA.   In addition, toll records obtained for the SANTIAGO cell phone for the period February through August 2003 show that between June 5, 2003 and August 31, 2003, there were 148 calls between the SANTIAGO cell phone and the Target Telephone .

**e.   Controlled purchases from Arroyo and Reyes**

33.   On November 21, 2003, CI-2 reported that RIVERA had approached him about purchasing CI-2's cellular telephone,

22

because RIVERA was interested in acquiring CI-2's former heroin customers. (CI-2 had previously told RIVERA that he was no longer selling heroin). On December 5, 2003, CI-2 sold his cellular telephone (with number 978-857-4960) to RIVERA. Per my instructions, prior to transferring the telephone to RIVERA, CI-2 programed Task Force Agent Marcos Chavez's (hereinafter "TFA Chavez") cellular telephone number into the phone's directory of drug customers.

### (i) Buy from Arroyo on December 10, 2003

34. On December 10, 2003, TFA Chavez, working in an undercover capacity, purchased one 10-gram "finger" from Santiago ARROYO, who CI-2 had identified as a "runner" for RIVERA (see ¶¶ 15 and 31 above). That day, at approximately 12:12 p.m., TFA Chavez called the number of the cellular telephone that CI-2 had sold to RIVERA (978-857-4960) and spoke with an Hispanic male who identified himself as "Rey."[14] TFA Chavez ordered one 10-gram "finger." "Rey" agreed to meet TFA Chavez at the Showcase Cinema on Reese Avenue in Lowell at 1:00 p.m. "Rey" said that he would be driving a blue Honda. The telephone call was tape recorded. At 12:12 p.m., immediately after TFA Chavez spoke to "Rey," pen register data shows an outgoing call from the Target Telephone to

---

[14] On December 15, 2003, CI-2 stated that RIVERA was no longer renting the room at the Motel 6, and had taken to moving his heroin on a daily basis to different hotels in the area. CI-2 also stated that RIVERA changed the number of the telephone CI-2 had sold to him from 978-857-4960 to 978-726-3971.

978-726-2612, a Sprint Cellular phone subscribed to by Santiago ARROYO at 1016 Middlesex Street, Lowell, Massachusetts ("the ARROYO cell phone"). Surveillance agents were following RIVERA both before and after TFA Chavez's phone call at 12:12 p.m. However, surveillance was discontinued at approximately 1:21 p.m., after RIVERA began driving in an evasive manner. Between 12:47 p.m. and 1:25 p.m., pen register data shows six additional calls between the Target Telephone and the ARROYO cell phone, all of which lasted less than two minutes.

35. At approximately 1:31 p.m., a blue Chevrolet Cavalier with Massachusetts license plate 1641SJ, which is registered to Santiago ARROYO, arrived at TFA Chavez's location at the Showcase Cinema. The vehicle was occupied by an unidentified Hispanic female and by Santiago ARROYO. After identifying himself as "Santiago," ARROYO handed TFA Chavez a clear plastic bag, which contained a brown pellet of heroin, in exchange for $950. When TFA Chavez complained that the price was too high, ARROYO stated that TFA Chavez would have to speak with "Rey" about that. At 1:34 p.m., three minutes after ARROYO met with TFA Chavez, pen register data shows an outgoing call from the ARROYO cell phone to the Target Telephone. Based on the foregoing, I believe that RIVERA is "Rey." DEA's Northeast Regional Lab concluded that the substance ARROYO sold to TFA Chavez was 9.6 grams of 40% pure heroin.

24

40

**(ii) Buy from Reyes on December 18, 2003**

36.   On December 18, 2003, TFA Chavez purchased three 10-gram "fingers" from Zuleima REYES.   That day, at approximately 12:00 p.m., TFA Chavez called the cellular telephone CI-2 had sold to RIVERA (978-857-4960), and a recorded message from an Hispanic male voice stated that the number had changed to 978-726-3971.   This number belongs to a Sprint PCS cellular telephone registered to Zuleima REYES, at 19 Conlon Terrace, in Lowell (hereinafter "REYES cell phone").   When TFA Chavez called the new number, REYES answered the call, identifying herself as "Linda." Since the date of that call, no one other than REYES has answered that phone number when TFA Chavez has called it, nor has anyone other than REYES called TFA Chavez from that number.   REYES explained that "Rey" was not around, and asked TFA Chavez what he wanted.   TFA Chavez said that he wanted to purchase thirty grams of heroin.   REYES replied that she only had one "finger" and that she would have to call "the Boss."   She asked TFA Chavez to call back in a little while.   Pen register data shows an outgoing call from the REYES cell phone to the Target Telephone at 12:12 p.m. that lasted 43 seconds.

37.   At approximately 12:20 p.m., TFA Chavez called REYES again.   This time, she agreed to meet him at the parking lot of the Showcase Cinema in Lowell.   REYES said that she would be driving a four-door green Dodge.   Pen register data shows an

25

41

outgoing call from the Target Telephone to the REYES cell phone
at 12:26 p.m. that lasted 37 seconds.  At approximately 12:51
p.m., TFA Chavez met with REYES in the parking lot of the
Showcase Cinemas.  REYES was driving a Green Dodge Stratus with
Massachusetts license plate number 26JX04, registered to Ramonita
Cedeno at 19 Conlon Terrace, Lowell, Massachusetts.  State
criminal records identify Ramonita Cedeno as REYES' mother.
There were two young children buckled into child safety seats in
the back seat of the car.  After a brief conversation (during
which TFA Chavez recognized REYES' voice as the voice of the
female with whom he had spoken on the phone), REYES handed TFA
Chavez a clear, plastic bag with three heroin pellets, in
exchange for $2,800.  REYES agreed that TFA Chavez could owe him
$50, which she claimed was her payment for delivering the drugs.
At 12:52 p.m., immediately after this transaction, pen register
data shows an incoming call from the REYES cell phone to the
Target Telephone that lasted less than two minutes.  DEA's
Northeast Regional Lab concluded that the substance REYES sold to
TFA Chavez was 29.4 grams of 57% pure heroin.

### (iii)  Buy from Reyes on January 7, 2004

38.  On January 7, 2004, TFA Chavez purchased two 10-gram
"fingers" of heroin from REYES.  That day, at approximately 12:56
p.m., TFA Marcos Chavez placed a tape-recorded phone call to the
REYES cell phone and ordered twenty grams of heroin from REYES,

26

42

who answered the phone.    REYES stated that she had to call her
"boss" for the heroin.    She instructed TFA Chavez to call her
back in five minutes.    REYES also asked TFA Chavez if he had the
fifty dollars that TFA Chavez owed her from the transaction on
December 18, 2003.    TFA Chavez replied that he did.    Immediately
after this call, pen register data shows an incoming call to the
Target Telephone from 978-455-2639, a land line registered to
REYES' mother (Ramonita Cedeno, at 19 Conlon Terrace, in Lowell).
The call lasted only two seconds, and therefore, may not have
been completed.    Nevertheless, between 12:58 p.m. and 1:12 p.m.,
there was a series of five more calls between the Target
Telephone and this same land line, each call lasting less than
one minute.    At approximately 1:31 p.m., TFA Chavez called the
REYES cell phone again, and spoke with REYES, who agreed to
conduct the transaction in the parking lot of the Showcase
Cinema.    Pen register data shows that the REYES cell phone then
placed a 20-second call to the Target Telephone at 1:34 p.m.    At
approximately 1:37 p.m., REYES arrived at the appointed location,
driving the same green Dodge Stratus.    Again, REYES had the same
two small children in car seats in the rear of the car.    After
parking next to TFA Chavez, REYES handed him two heroin pellets
wrapped in plastic, in exchange for $1,950.    In response to TFA
Chavez's inquiries, REYES stated that "the boss" would not sell
the heroin for less than $875 per "finger."    REYES also stated

27

43

that "the boss" could supply as much heroin as TFA Chavez wanted. Pen register data does not pick up additional telephonic contact between the Target Telephone and the two phones associated with REYES until 1:53 p.m. DEA's Northeast Regional Lab concluded that the substance REYES sold to TFA Chavez was 20 grams of 36% pure heroin.

### (iv) Arrest of Mark Heisig

39. After this transaction, REYES was followed to the St. Hilaire Laundromat and Car Wash at 1682 Middlesex Street in Lowell, where she was observed engaging in a hand-to-hand transaction with a ▆▆▆▆▆▆ male. The ▆▆▆ male was followed, stopped, and identified ▆▆▆▆▆▆▆▆▆▆▆▆ . After officers discovered 10 bags (constituting approximately one-half of a gram) of heroin under the center console of the vehicle, ▆▆▆▆ agreed to cooperate with police.

40. ▆▆▆▆ was transported to the Lowell Police Department, where he provided a signed, written statement. In that statement, ▆▆▆▆ advised that he had been purchasing 10 bags of heroin from "Linda" two to three times a week since early December 2003. Based on all of the foregoing, I believe that REYES is "Linda." ▆▆▆▆ provided the arresting officers with the number of the REYES cellular telephone (978-726-3971), and stated that he used that number to call REYES to order drugs, and that he and REYES would conduct their drug transactions at various

28

44

locations in Lowell.

**(v)  Buy from Reyes on January 14, 2004**

41.  On January 14, 2004, TFA Chavez purchased approximately
46 grams of heroin from REYES.  That day, at approximately 12:14
p.m., REYES called TFA Chavez from the REYES cell phone,
responding to a message TFA Chavez had left for her on the phone
earlier that day.  TFA Chavez ordered fifty grams of heroin from
REYES, who replied that she had at least thirty grams at her
house, but that she might not have all fifty.  REYES stated,
nevertheless, that she would be ready to meet with TFA Chavez at
1:00 p.m.  When TFA Chavez then began to negotiate the price of
the heroin, REYES stated that TFA Chavez would have to talk to
"Rey" about that.  REYES then arranged a three-way conference
call between herself, TFA Chavez, and "Rey."  Pen data confirms
an outgoing call from the REYES cell phone to the Target
Telephone at 12:16 p.m. that lasted one minute, thirty seconds.
After joining the conversation, "Rey" (i.e. RIVERA) told TFA
Chavez that he would lower the price to $900 per ten grams of
heroin, but only if TFA Chavez intended to purchase large
amounts.  The conversation was tape recorded.  The parties agreed
that TFA Chavez would meet REYES at the Showcase Cinema in
Lowell.  Pen register data shows a call from the Target Telephone
to the REYES cell phone at 12:18 p.m., shortly after the
termination of the conference call.  This call lasted one minute,

29

45

fifty-three seconds.

42. At approximately 1:00 p.m., after arriving at the parking lot of the Showcase Cinema, TFA Chavez called the REYES cell phone. REYES answered, and explained that she only had four and a half "fingers," or approximately forty-five grams of heroin. TFA Chavez insisted that he wanted all fifty grams. REYES responded that she would call "Rey" and that she would call TFA Chavez back in five minutes. Pen register data confirms an outgoing call from the REYES cell phone to the Target Telephone at 1:04 p.m. that lasted two minutes, 35 seconds, and another outgoing call from the REYES cell phone to the Target Telephone at 1:13 p.m. that lasted only eight seconds. At 1:25 p.m., REYES called TFA Chavez from the REYES cell phone and stated that she only had forty-six grams and that the price would be $4,300. She further stated that she did not want to meet at the Showcase because she feared detection. REYES specifically referenced security cameras and security guards in the area, as well as a police cruiser that patrolled the nearby Cross Point Towers. REYES also stated that recently "somebody" (which TFA Chavez took to mean another drug dealer) had been arrested in the area. As a result, TFA Chavez agreed to follow REYES to a quiet side street near the intersection of Chelmsford and Stevens streets in Lowell. The conversation was tape recorded.

43. Subsequent to this phone call, surveillance officers

30

46

followed REYES from her residence at 19 Conlon Terrace in Lowell directly to the meeting with TFA Chavez.[15]  At approximately 1:37 p.m., REYES, again with her two young children in the back seat, met TFA Chavez on West Albert street in Lowell, where she gave him a plastic bag with six pieces of light brown heroin, in exchange for $4,300.  DEA's Northeast Regional Lab concluded that the substance REYES sold to TFA Chavez was 45.7 grams of 39% pure heroin.

### f.    Trash searches at Old English Village

44.    On July 17, 2003 and October 6, 2003, officers retrieved RIVERA's trash from the dumpster at Old English Village.  I later examined the trash and found, among other items, bank records, Nextel cellular telephone bills for the Target Telephone, and a sheet of paper with various names and various dollar amounts exceeding $2,000.  Based on my training and experience and my analysis of these materials, I believe that this latter document is a drug ledger containing a written record of drug customers who owed money to RIVERA or someone associated with RIVERA.

### g.    Financial investigation

45.    Based on the bank records seized during the trash

---

[15]    Surveillance officers noted that the license plate displayed on REYES's green Dodge Stratus had been changed to 87EA40, which is now registered to Zuleima REYES at 19 Conlon Terrace.

31

47

searches, in October 2003, I obtained a grand jury subpoena to obtain records from RIVERA's bank account at Jeanne D'Arc Credit Union. A review of these bank records indicates that RIVERA opened a joint savings account with his girlfriend, Janice Perez, on November 21, 2001. RIVERA listed his employer as Kmart. An analysis of the bank statements from September 6, 2002 to September 30, 2003 indicates that RIVERA's payroll check is deposited into this account once a week, each deposit averaging $400. The total of all payroll deposits for the time period listed was $21,835. There do not appear to be any deposits that are obviously attributable to Janice Perez. In the same time period, there were cash deposits to the account totaling $46,045 and cash withdrawals totaling $67,300. As of February 6, 2004, the balance in the account was $32,218.

### h.    Pole camera

46.    In December 2003, a pole camera was installed on the premises of Old English Village at an angle that should have provided a clear view of the parking lot outside of Building #2 (i.e., RIVERA's address, 235 18th Street). However, due to ongoing technical problems with the camera (i.e., no picture was visible on the monitor screen), no recordings were ever made. In any event, the pole camera was discontinued after RIVERA's eviction from Old English Village on February 17, 2004.

48

### 3. Jose Torrado Investigation

47. On January 5, 2003, I learned that CI-1 had reported to the Lowell Police that during a home invasion at 241 Moody Street in Lowell (where Jose TORRADO resides with his girlfriend) TORRADO had been robbed of 140 ten-gram "fingers" of heroin (approximately 1.4 kilograms) and $10,000 in cash. CI-1 further stated that, as a result, TORRADO was looking for a gun.

48. Also on January 5, TORRADO, while operating the silver Toyota Matrix registered to RIVERA, was observed by Detective Felix Figueroa of the Lowell Police Department conducting a hand-to-hand transaction with two ███ males at the Music Mall on Chelmsford Street in Lowell. The two ███ males were followed as they departed the area in their vehicle. The vehicle was stopped by the police, and ██████████████████████████ ████████████████████████████. Although no heroin was discovered, both men admitted to having just bought heroin from the individual driving the silver Matrix, who they knew as "Jose." ██████████████ stated that they had thrown the heroin out of the window before the car stop. ██████████ ████████ voluntarily returned to the Lowell Police Department, where they were interviewed. ███████ identified a picture of TORRADO as the "Jose" who had sold heroin to ████████████. ████████ stated that he had been purchasing between one and three grams of heroin from TORRADO once a week for approximately four

33

months. ██████ said that he contacted TORRADO by calling

TORRADO's cellular telephone number: 978-479-8210. ██████

██████ admitted to accompanying NOCERA to purchase heroin from

TORRADO on approximately 10 occasions.  Both subjects provided

signed written statements attesting to this information.

49.    The statements ██████████████ are corroborated

by pen register data showing that there was one call on December

5, 2003 and another on January 5, 2004 between the Target

Telephone and ████████████████████████████████████.

████████████████████████████████████████████████,

██████████.    Pen register data also shows that ██████ called

the Target Telephone ████████, shortly after he was released

from police custody.  Because ████████████████████████,

and given his claim that he threw the heroin he had purchased

from TORRADO out of the window of his car, I believe that NOCERA

was contacting RIVERA to purchase more heroin.

### 4.    Investigation of Julio Santiago

#### a.    Information from CI-1

50.    On January 8, 2004, CI-1 advised Detective John Samaras

of the Lowell Police Department that Julio SANTIAGO was now

meeting Reynaldo RIVERA approximately once a week to deliver

between 500 to 1000 grams of heroin to RIVERA.  CI-1 stated that

RIVERA and SANTIAGO had been meeting at the Pheasant Lane Mall in

Nashua, New Hampshire, where they had met within the past couple

34

of days during which meeting SANTIAGO had supplied 500 grams of
heroin to RIVERA.

### b.    Information from CI-2

51.  On January 13, 2004, CI-2 advised me that he had very
little information about RIVERA's supplier but that CI-2 believed
that the supplier was Dominican and was from Lowell.  CI-2 stated
that when RIVERA ran out of heroin he would meet with his
supplier and pick up between 500 and 700 grams of heroin at a
time.  CI-2 stated that CI-2 had been trying to find out the
identity of the supplier for two years and had been unsuccessful.
CI-2 referred to the supplier as a "Ghost."  CI-2 has never
identified RIVERA's supplier.  In fact, CI-2 did not recognize a
photograph of SANTIAGO that was shown to him.

### c.    Information from Lowell Police

52.  On January 13, 2004 I also spoke with Officer Peter
Kelleher of the Lowell Police Department about SANTIAGO.  Officer
Kelleher was formerly a Task Force Agent in the DEA Cross Borders
Initiative, and in that capacity, had initiated an investigation
into Julio SANTIAGO in 1996.  Officer Kelleher stated that his
investigation into SANTIAGO ultimately was unsuccessful, in large
part, because of SANTIAGO's skill at spotting physical
surveillance.  Officer Kelleher stated that SANTIAGO detected the
surveillance every time he was followed.  Officer Kelleher stated
that physical surveillance was made even more difficult by the

35

51

fact that he was never able to firmly establish SANTIAGO's place of residence. Thus, the agents could begin their physical surveillance of SANTIAGO only after receiving advance informant information about where SANTIAGO could be found at a particular place and time. Surveillance of the residence to which SANTIAGO's vehicles were registered, 28 Clark Rd, Shirley MA, were unsuccessful in placing him at that location. Officer Kelleher, who knew nothing of my conversation with CI-2 about RIVERA's source of supply, referred to SANTIAGO as a "ghost."

53. At this time the only address available for SANTIAGO is that same 28 Clark Street address. Physical surveillance conducted at this address on August 1, 2003 and again on January 31, 2004 did not reveal any of the vehicles associated with SANTIAGO at that location.

### d. Information from CI-3

54. On January 20, 2004, CI-3 advised me that on January 18, 2004, at approximately 12:30 p.m., CI-3 had observed the SANTIAGO minivan parked in the middle of the parking lot at Old English Village. CI-3 said that, at that time, CI-3 saw an unidentified Hispanic male in the driver seat, and RIVERA in the front passenger seat. The meeting lasted a brief period of time, after which RIVERA exited the vehicle and entered Building #2. The operator of the SANTIAGO minivan remained in the parking lot for a short time, then drove away. Pen register data from that

36

52

day shows four contacts between the Target Telephone and the SANTIAGO cell phone beginning at 8:52 a.m. and ending at 11:58 a.m. I later showed a picture of SANTIAGO to CI-3, who positively identified SANTIAGO as the person in the SANTIAGO minivan who met with RIVERA on January 18, 2004.

      **e.   Surveillance on July 29, 2003**

55.   On July 29, 2003, law enforcement established surveillance at Old English Village. At approximately 12:20 p.m., RIVERA was observed sitting in a blue Toyota bearing Massachusetts license plate number 9191SJ. The Toyota was parked in the far corner of the parking lot, in the same area described by CI-3 as the location where he had observed the aforementioned transactions. The vehicle was running and was backed into the parking space, providing RIVERA with an unobstructed view of the entire parking lot. After approximately five minutes, the SANTIAGO minivan pulled into the parking lot and parked next to the Toyota. At that point, RIVERA exited the Toyota, entered the minivan, and conducted a hand-to-hand exchange with the operator of the van. RIVERA then exited the van, carrying a small tan container resembling a paper bag or cardboard box in his right hand. He did not possess the item prior to entering the minivan. The minivan then departed the area, and RIVERA re-entered the Toyota and drove to a different section of the parking lot, where he parked and appeared to be manipulating something with his

37

53

hands in the area of his lap. During this time, RIVERA visually scanned the parking lot, periodically. After a short time RIVERA parked the Toyota next to his black Yukon, exited the vehicle carrying the package he had picked up from the minivan, and entered Building #2.

**f.   Surveillance on January 26, 2004**

56.   On January 26, 2004, I initiated surveillance in the parking lot of Old English Village. At about 12:40 p.m., I observed SANTIAGO, operating the SANTIAGO minivan, enter the parking lot and park his vehicle. Within two minutes, I observed RIVERA walk out of Building #2 and over to the SANTIAGO minivan. RIVERA did not have anything in his hands as he walked to the minivan. RIVERA then got into the front passenger seat of the minivan, emerging after a brief moment. As RIVERA came out of the minivan, I saw him transfer a package from one of his hands into his coat pocket, before he walked back into Building #2. SANTIAGO then drove the minivan out of the parking lot. Because I was on foot at the time, I was unable to follow SANTIAGO.

**g.   Surveillance on February 8, 2004**

57.   On February 8, 2004, Detective John Seamans of the Dracut Police Department, while conducting surveillance in the parking lot of Old English Village, observed what he believed to be a drug transaction between SANTIAGO and an Hispanic male who was operating a black Acura Integra with New Hampshire license

38

54

plates.     Specifically, that day, at approximately 12:52 p.m.
Detective Seamans saw SANTIAGO arrive in the parking lot in the
SANTIAGO minivan, park the minivan next to a dumpster and wait.
Approximately six minutes later, the Hispanic male in the Integra
arrived, got out of his vehicle, and walked towards the direction
of Building #2 (where RIVERA was living at the time).   Because of
his stationary location, the detective could not observe where
this individual went.   Approximately two minutes later, however,
the Hispanic male from the Integra reappeared and walked directly
to the SANTIAGO minivan.   This person then entered the front
passenger door of the minivan.   At the time he entered the
minivan, the Hispanic male had nothing in his hands.   However,
when he emerged from the minivan approximately three minutes
later, he was holding a brown, baseball-sized package in his
right hand.   The Hispanic male then got into the Integra, as
SANTIAGO drove out of the parking lot.   After approximately four
minutes, during which he appeared to be secreting something
inside the Integra, the Hispanic male also drove out of the
parking lot.   Based on the foregoing, I believe that SANTIAGO
distributed narcotics to the Hispanic male in the Integra.

### h.    Review of pen register and toll records

58.    As discussed above, the pen register and trap and trace
device monitoring the Target Telephone shows 57 contacts between
the Target Telephone and the SANTIAGO cell phone between November

39

55

7, 2003 and February 23, 2004, and toll records show an
additional 148 contacts between those two phones between June 5
and August 31, 2003.  In addition, between January 8 and February
23, 2004, there were 65 calls between the SANTIAGO cell phone and
one of the four cellular telephones subscribed to by Jose TORRADO
(978-479-8210).  Pen register data shows a total of 574 contacts
between the Target Telephone and this same TORRADO cell phone
during the period between November 7, 2003 and February 23, 2004.

### 5.    Prior Investigations of Julio Santiago

59.    SANTIAGO was the target of two prior DEA
investigations, one beginning in 1992, the other in 1996.
Although these investigations unearthed evidence showing that
SANTIAGO was a narcotics trafficker, as discussed below, neither
investigation resulted in SANTIAGO's arrest or prosecution.

### a.    1992 Investigation

60.    In October 1992, the DEA commenced an investigation of
SANTIAGO, based upon information from several reliable
confidential informants that SANTIAGO was the head of a large-
scale heroin distribution organization operating in the greater
Lowell area.  According to these informants, this drug group was
distributing between 10,000 to 12,000 bags of heroin per week, in
addition to multi-ounce quantities of loose, powdered heroin.
The informants stated that SANTIAGO employed approximately three
individuals in his heroin business, including Juan Concepcion,

40

56

who was the main runner, and Concepcion's girlfriend, Aurea
Rivera, who assisted in the money laundering end of the business.
The informants reported that SANTIAGO traveled to New York City
every two to three weeks to purchase heroin.

61.   The information that SANTIAGO traveled to New York to
purchase heroin was corroborated by certain events that
transpired on February 20, 1992.  That day, during a routine
highway car stop of a vehicle being operated by SANTIAGO, the
Massachusetts State Police discovered that SANTIAGO, who stated
that he was on his way to New York, was transporting
approximately $20,000 in cash.  Although no narcotics were
discovered, the money was seized.  I have not been able to
definitively determine whether the funds ultimately were
forfeited.

62.   On February 25, 1993, DEA Special Agent Joseph
Tamuleviz, who had been introduced to SANTIAGO by an informant,
attempted to make a controlled purchase of heroin from SANTIAGO.
After negotiating the transaction with SANTIAGO, when Special
Agent Tamuleviz arrived at the appointed location, SANTIAGO had
instead sent his drug runner, Juan Concepcion, from whom the
agent purchased 50 bags of heroin.  The investigation became
stagnant, and eventually was terminated in September 1993, after
numerous attempts to introduce another undercover agent to
SANTIAGO proved fruitless.

41

57

### a.    1997 investigation

63.    In 1996, based on new reliable informant information,
and after the Massachusetts State Police seized approximately
$27,000 from a vehicle being operated by SANTIAGO, the DEA opened
a new investigation of SANTIAGO.  Specifically, several reliable
confidential informants had advised law enforcement that SANTIAGO
and his associates were distributing large amounts of heroin in
the Lowell area.  On November 19, 1996, during a traffic stop of
a rental vehicle being operated by SANTIAGO, the State Police
discovered approximately $27,000 in cash in the car.  SANTIAGO
gave several conflicting explanations for the presence of the
money, including a claim that he was taking the money to a sick
uncle in Philadelphia.  A drug detection dog was brought to the
scene.  The dog gave a strong indication for the presence of
narcotics at several locations in the vehicle, including the
location where the money was found.  However, no narcotics were
found in the vehicle.  Nevertheless, the $27,000 was seized.
Based upon conversations with members of the Massachusetts State
Police, it appears that at least $10,000 of that money was
forfeited.

64.    On October 14, 1997, a cooperating witness made a
controlled purchase of 200 bags of heroin from SANTIAGO's drug
associate, "Andy."  The very next day, however, Andy complained
to the cooperator that he had been followed by law enforcement

42

after the transaction. Thereafter, neither Andy nor SANTIAGO
would sell heroin to the cooperator. Other investigative
techniques produced no results. For example, physical
surveillance of SANTIAGO quickly became futile because of
SANTIAGO's aggressive counter-surveillance practices. Use of an
automobile tracking device to follow SANTIAGO to Pennsylvania
resulted in agents following him to a funeral. In early 1998,
efforts were being made to obtain authorization to intercept
pages to SANTIAGO's pager. However, before the application could
be submitted for judicial approval, SANTIAGO appeared to
disappear from Lowell, and agents could not locate him.
Eventually, the investigation was terminated.

65. Based on the foregoing, there is probable cause to
believe that the Target Telephone will be used during the period
of interception applied for herein by the named Target Subjects,
and others as yet unknown, in order to accomplish, to discuss,
and to commit the crimes described in ¶ 4 above. In addition,
these wire communications are expected to constitute admissible
evidence of the commission of the offenses described in ¶ 4
above.

## IV. NEED FOR INTERCEPTION

66. The major goals of this investigation are to: (a)
infiltrate the upper echelon of RIVERA's heroin distribution
network, to determine the full extent of his current and

43

59

historical drug trafficking and money laundering activities, and
to confirm that SANTIAGO is a regular source of supply of heroin
for RIVERA; (b) identify whether RIVERA has other sources of
supply, and determine who might be RIVERA's transporters,
managers, financiers, distributors, and major customers; (c) find
out the dates, times, and places when the Target Subjects and
their as yet unidentified associates will be committing the
offenses referred to in ¶ 4 above; (d) ascertain where the Target
Subjects store and maintain their narcotics; and (e) determine
where and how the Target Subjects dispose of their drug proceeds,
and the location of any documents or other records concerning
their drug distribution.

   67.  As demonstrated above and discussed below, I, together
with the other agents involved in this investigation, have
employed various investigative methods to try to accomplish these
goals, but have had only limited success.  For example, other
than RIVERA, I have not been able to identify other SANTIAGO
heroin customers; nor have I been able to identify SANTIAGO's
sources of supply.  Conversely, I have not been able to determine
whether RIVERA has sources of supply other than SANTIAGO.  Aside
from learning that RIVERA conducts a large portion of his banking
transactions in cash, I do not know how RIVERA or any of the
other Target Subjects transport, manage, store or dispose of
their narcotics proceeds.  I believe that the interception of

44

60

wire communications over the Target Telephone is the only available technique that has a reasonable likelihood of securing the evidence necessary to accomplish all of the goals of this investigation.

68.  Because it appears that RIVERA uses the Target Telephone to communicate with other Target Subjects and other drug associates, the interception of wire communications over the Target Telephone, used in conjunction with other techniques, will assist me in learning, among other things:

a.   the identities and whereabouts of the Target Subjects and other members of RIVERA's drug organization, including RIVERA'S customers and sources of supply;

b.   the full extent of the participation of the Target Subjects and their sources of supply, transporters, managers, financiers, distributors, and major customers in commission of the offenses referred to in ¶ 4 above;

c.   the dates, times, and places of the commission of specific drug trafficking and possible money laundering offenses;

d.   the location, receipt, administration, control, management, and disposition of the narcotics and narcotics proceeds of the Target Subjects, and records of transactions; and

f.   the methods by which the Target Subjects and other members of RIVERA's drug organization conceal the assets acquired as a result of their narcotics trafficking.

45

61

## VI.  EXHAUSTION OF NORMAL INVESTIGATIVE TECHNIQUES

69.  The interception of wire communications made to and from the Target Telephone is necessary in this matter because traditional investigative techniques have been tried and failed, reasonably appear to be unlikely to succeed if tried or continued, or are too dangerous to employ. The following is a discussion of the investigative techniques that have been used, or that I have considered and rejected to date in this investigation, and why these techniques have failed, are too dangerous, or are not likely to succeed in bringing about the aims of the investigation.

### A.  Use of Cooperators

70.  Other law enforcement agents and I have received information and assistance in this investigation from four different confidential informants with information relevant to this case. Although these individuals have provided reliable information relative to the investigation that has been corroborated by other aspects of the investigation, the information they have provided is limited in nature, and much of it is further limited by the fact that three of the four cooperators (CI-1, CI-3, and CI-4) do not want to testify in court, for fear of retaliation; and the fourth cooperator (CI-2) has been deemed unsuitable to testify in court, because he violated the terms of his cooperation agreement with the DEA by

46

getting arrested after the commencement of his cooperation. Even if all four cooperators were willing and eligible to testify, they still would not be able to assist me in infiltrating the upper echelons of RIVERA's heroin-trafficking organization. For example, CI-3 does not know RIVERA personally, and RIVERA would regard CI-1, CI-2 and CI-4 as mere customers. In my experience, drug dealers of RIVERA's stature usually do not disclose confidential information about their narcotics trafficking to their customers. Indeed, CI-2, who has known RIVERA for years and who purchased heroin from RIVERA for two years prior to this investigation, has never been introduced into the upper level of RIVERA's drug business.

### B.   Use of Undercover Agents

71.   As noted above, an undercover DEA agent already has infiltrated the RIVERA organization. However, even though the undercover agent has been able to purchase heroin from, and therefore identify, two of RIVERA's subordinates, it is unlikely that he can accomplish much more than that, because the undercover agent has never met RIVERA. Even in the unlikely event that the undercover agent were to be introduced to RIVERA, it is unlikely that he could do anything other than buy heroin from RIVERA, which would put him in no better position than CI-1 and CI-2. As discussed, mid-to high-level drug traffickers such as RIVERA tend to deal only with individuals they know well and

63

trust.    They do not disclose the sort of information I am seeking about their operations to mere customers, especially those they have recently met.

72.    In addition, I do not currently have a cooperator who is in a position to introduce an undercover agent to SANTIAGO. Even if this were not the case, for the same reasons discussed above with respect to RIVERA, I do not believe that introducing an undercover agent to SANTIAGO would significantly advance the goals of this investigation.    Indeed, as discussed above, in the 1992 and 1996 investigations, the DEA was never able to successfully purchase heroin directly from SANTIAGO.    Thus, more extensive use of undercover agents is not a feasible alternative to the interception of wire communications.

## C.    Physical Surveillance

73.    Physical surveillance has been used in this investigation, with varying degrees of success.    For example, physical surveillance has connected RIVERA to Old English Village and to a property at 1016 Middlesex Street in Lowell, which CI-2 identified as one of RIVERA'S stash houses.    In addition, physical surveillance has established that, prior to February 17, 2004, SANTIAGO had been meeting with RIVERA in the parking lot at Old English Village, apparently to deliver heroin, as had been reported by CI-3.    However, there are three major problems with physical surveillance in this case.    First, it is difficult to

48

know when SANTIAGO and RIVERA will be conducting their drug
transactions without constant physical surveillance.  Second,
even if this were a viable option, I have been unable to locate
SANTIAGO's residence, thereby making it extremely difficult to
begin following him.  Third, heavy reliance on physical
surveillance is risky, and could prove deleterious to the
investigation, because RIVERA and SANTIAGO are very conscious of
physical surveillance by law enforcement.  For example, on
December 10, 2003, the day that TFA Chavez purchased a 10-gram
"finger" from Santiago ARROYO, agents were forced to discontinue
physical surveillance of RIVERA, after RIVERA began driving in an
erratic and evasive manner.  In addition, experience from the
1992 and 1996 investigations of SANTIAGO indicates not only that
SANTIAGO himself is quite adept at detecting physical
surveillance, but that he also is willing to employ very
aggressive counter-surveillance driving techniques.

D.    **Use of Telephone Toll Records and Pen Registers**

74.  With respect to the Target Telephone, telephone toll
records were obtained for the period March 29, 2003 through
August 3, 2003.  Telephone toll records were obtained for the
SANTIAGO cell phone for the period February 2003 through August
2003.  On October 17, 2003 and December 24, 2003, I applied for
and received permission to install and monitor a pen register and
trap and trace device on the Target Telephone and the SANTIAGO

49

65

cell phone, respectively.  Those devices remain active today.
While the telephone toll information and the pen register data
have been of assistance in this investigation, they have provided
only limited information.  One limitation of toll and pen
register information is that such information does not reveal the
identity of the parties speaking over the telephone.  Although
the DEA has obtained subscriber information for many of the
numbers in contact with the Target Telephone and the SANTIAGO
cell phone, there is no guarantee in the case of either phone
(or, indeed, in the case of any particular phone call) that the
subscriber is also the speaker.  A more important limitation of
toll and pen register information is that it does not reveal the
content of the calls being made over the phones.  Thus, these
methods do not enable law enforcement officers to identify with
certainty the persons involved in the conversations or the
significance of the communications in the context of ongoing
narcotics trafficking and money laundering activity.

**E.    Trash Searches**

75.    I have utilized trash searches in this investigation
with good results.  Specifically, documents retrieved from two
different searches of RIVERA's trash produced a drug ledger and a
telephone bill that can be used as evidence at trial, as well as
a bank statement that led to the issuance of a grand jury
subpoena for RIVERA' bank records at Jeanne D'Arc Credit Union.

50

66

SANTIAGO's trash has not been searched because I do not know where he resides or where he disposes of his trash.  Morever, despite the usefulness of the evidence gathered from RIVERA's trash, it is extremely unlikely that more extensive trash searches would obviate the need for a wiretap.  Even if it were feasible to search all of the trash of all of the Target Subjects, based on my experience, I doubt that their trash would produce evidence sufficient to accomplish all of the stated goals of this investigation.

### F.    Financial Investigation

76.    A financial investigation of RIVERA already has commenced.  As noted above, I have obtained RIVERA's bank statements from the Joan D'Arc Credit Union, an analysis of those records indicates that RIVERA regularly deposits and withdraws a substantial amount of cash, far beyond and above his earnings from K-Mart.  Although I intend to continue investigating RIVERA's finances and assets (for potential forfeiture down the road), I do not believe that a financial investigation, even in conjunction with the other normal investigative techniques discussed herein, is sufficient to accomplish the goals of this investigation.

### G.    Use of the Grand Jury

77.    I have utilized the Grand Jury to obtain subpoenas for financial information and telephone records relative to this

investigation.  However, based upon my training and experience, my consultations with other trained and experienced law enforcement officers, the facts of this case, and my discussions with Assistant United States Attorneys for the District of Massachusetts who have experience prosecuting criminal cases, I believe that summoning Target Subjects or their associates before a Federal Grand Jury would not substantially assist me in achieving the stated goals of this investigation.  If called to testify before the Grand Jury, the Target Subjects or their associates would most likely be uncooperative and/or invoke their Fifth Amendment privilege not to testify.  The United States likely would not seek to immunize these persons because that might foreclose prosecution of the most culpable individuals. Morever, granting immunity to targets of the investigation would not ensure that they would testify truthfully before the Grand Jury.

78.  The service of Grand Jury subpoenas upon Target Subjects or their associates would also alert them to the existence of this investigation.  That would likely cause targets of the investigation to become more cautious in their activities, to flee to avoid further investigation or prosecution, destroy or conceal evidence, or otherwise to compromise this investigation.

**H.    Pole Camera**

79.  On December 12, 2003, a DEA technician installed a pole

camera in the parking lot of Old English Village, in order to capture RIVERA's meetings at that location. However, due to technical difficulties, I was never able to gather any evidence from that device, after RIVERA was evicted from Building #2 on February 17, 2004.

I.    **Search Warrants**

80.    The execution of search warrants at the end of this investigation will undoubtedly be pursued. To date, however, as noted earlier, I have not been able to obtain sufficient information about the places where the Target Subjects store their drugs, drug paraphernalia, or drug proceeds, to obtain a warrant to search any such locations. Nor would the execution of search warrants at this point in the investigation, even in combination with other normal investigative means, be likely to reveal the identity of all of RIVERA's and SANTIAGO's criminal associates, suppliers, financiers, distributors, and major customers, their methods of operation, their money laundering activities, and the date, time, and place of planned drug deals. At the same time, the execution of search warrants would alert Target Subjects to the investigation's existence. This, in turn, would likely cause the Target Subjects to become more cautious in their activities, to flee to avoid further investigation or prosecution, to destroy or conceal evidence, or otherwise to compromise this investigation. Moreover, the usefulness of a

53

search at Old English Village is nullified by RIVERA's use of "stash" locations, and the fact that RIVERA recently was been ordered to leave his residence as a result of a domestic complaint.[16] In sum, although search warrants will likely be used later in the investigation, the interception of wire communications is necessary to identify the places to be searched, to maximize the effectiveness of future search warrants, and to link the drug suppliers, distributors, customers, and money launderers to any contraband or records recovered as a result of those searches.

## VII. DURATION OF INTERCEPTION

81.    This Affidavit is submitted in support of an application to intercept wire communications to and from the Target Telephone for a period not to exceed thirty (30) days, as measured in the manner discussed below.  As demonstrated by the facts contained in this Affidavit, the narcotics trafficking conspiracy under investigation is ongoing in nature and involves the Target Subjects as well as other unknown individuals.  It is the goal of this investigation to determine the full scope, membership, and method of operation of the conspiracy. Therefore, I request that interception not be ordered terminated

---

[16]    Even though two officers of the Dracut Police Department entered the apartment of Reynaldo RIVERA when they executed the restraining order on February 17, 2004, the officers did not notice any signs that narcotics were being stored at, processed in, or sold out of that location.

54

upon the first interception of a conversation regarding narcotics trafficking, but be allowed to continue until the full scope of the conspiracy, the persons involved, and their respective roles are determined or for thirty (30) days, whichever comes first. It is further requested, pursuant to 18 U.S.C. § 2518(5), that the thirty (30) day period for the interception of wire communications over the Target Telephone be measured from the day on which investigative or law enforcement officers first begin to conduct an interception under this court's order or ten (10) days after the order is entered, whichever is earlier.

## VIII.  **MINIMIZATION**

82.    The requirements regarding the minimization of interception will be strictly followed.  Before interception begins, a memorandum regarding minimization and a copy of the Court's Order authorizing interception will be provided to all monitoring agents.  A copy of the Order and minimization memorandum will be posted at the listening site.  Before an agent begins to intercept communications, he or she will sign a form indicating that he or she has read the Affidavit, the Court's Order authorizing interceptions, and the minimization memorandum; is familiar with the contents of the Order; has attended a minimization meeting; and will intercept communications in compliance with the Court's Order.

83.    All wire communications will be minimized in accordance

55

71

with Chapter 119 of Title 18 of the United States Code.
Interception will be suspended immediately when it is determined
through voice identification, physical surveillance, or
otherwise, that none of the Target Subjects or any of their
criminal associates, once identified, is participating in a
conversation, unless it is determined during the portion of the
conversation already overheard that the conversation is criminal
in nature. Even if one of the Target Subjects or their criminal
associates, once identified, is a participant in a conversation,
monitoring will be suspended if the conversation is not criminal
in nature or not otherwise related to the offenses under
investigation. Based on information provided by other monitoring
and supervising agents, I believe that many narcotics-related
conversations may occur in the course of otherwise innocent
conversations. Once interception has begun, monitoring agents
will use information obtained from previous interceptions to help
determine whether a particular call should be minimized as a non-
pertinent call. Lengthy conversations that appear to be non-
pertinent periodically will be monitored to determine if the
conversation has become criminal in nature. All intercepted wire
conversations will be recorded and all recordings will be
securely preserved. Logs will be prepared regarding the date and
time of calls, the parties involved, the subject matter of the
calls, and if and when minimization occurred. Reports detailing

56

72

the course of the interception will be filed with the Court on or about the tenth and twentieth days following the commencement of interception pursuant to the Court's order.   Particular emphasis will be placed on reporting minimization efforts to the court.

84.  Monitoring agents will be advised to follow normal minimization procedures with respect to any intercepted communications involving an attorney.  Monitoring agents will be advised that a privilege attaches to communications between an attorney and an individual concerning a matter in connection with which the attorney represents that individual.  They will be instructed to suspend monitoring of a conversation as soon as they learn that it concerns such a matter, so long as there is no reason to believe that the purpose of the conversation is to further crime or fraud.

85.  I have been advised that both RIVERA and TORRADO currently are charged with misdemeanor disorderly conduct in Lowell District Court.  To the best of my knowledge, none of the other named Target Subjects faces any pending state or federal criminal charges, except as previously indicated in this Affidavit.  However, all monitoring agents will be instructed to minimize all conversations involving an attorney and a party represented by that attorney if the conversation pertains to the represented party's culpability in relation to an indictment or charges against him or her or the strategy which he or she

57

contemplates employing in defense of such charges.

86. All intercepted wire conversations will be recorded and all recordings will be securely preserved. Logs will be prepared regarding the date and time of calls, the parties involved, the subjects of the calls, and if and when minimization occurred. Reports detailing the course of the interception will be filed with the court on or about the 10th and 20th days following the commencement of interception pursuant to the court's order. Particular emphasis will be placed on reporting minimization efforts to the court.

87. It is anticipated that many of the conversations to be intercepted will be in Spanish. I expect to use Spanish-speaking DEA Special Agents and Task Force Agents, law enforcement officers, and contract personnel, acting under the supervision of investigative or law enforcement officers who are authorized to conduct the interception. Because it is anticipated that most of the wire communications to be intercepted will be in the Spanish language, it is expected that an expert in the Spanish language will be available for translation whenever possible. Pursuant to 18 U.S.C. § 2518(5), the following minimization procedures have been established in the event that conversations in a code or other foreign language are intercepted:

    (a) If foreign language translators are not reasonably available to minimize wire communications at the time of interception, all such wire communications will be intercepted and recorded in their entirety;

58

74

(b)    In the event the translator is not a federal agent, the
       translator, whether he or she is a language-trained
       support employee or under contract to the government,
       will be under the supervision of a federal agent or
       other law enforcement officer;

(c)    Wire communications monitored by the translator under
       the guidance of a federal agent or other law
       enforcement officer will be minimized by the translator
       and an English translation of the pertinent criminal
       conversations will be furnished to the supervising
       federal agent or other law enforcement officer; and

(d)    I believe that this procedure, which provides for
       after-the-fact minimization of foreign languages used
       by the named intercepts when there is no expert
       reasonably available to translate the conversation,
       complies with 18 U.S.C. § 2518(5) and its provisions
       for specialized minimization procedures when
       intercepting communications conducted in a foreign
       language.

    88.   Agents will also attempt to minimize any voice mail

messages to the Target Telephone that are intercepted.  However,

it is unclear whether it will be possible to set up a system that

will permit agents to intercept voice mail messages left on the

Target Telephone on a "real time" basis.  In other words,

monitoring individuals may not be able to listen to messages at

the precise moment the messages are being left by callers.

However, it may be possible to intercept the voice mail messages

as they are being retrieved by persons using the Target

Telephone.  In the event that this is possible, although the

interceptions will not be made at the time the messages are left,

monitors will be able to minimize the messages at the time that

they are being retrieved.  This would be very similar to a real

59

75

time minimization procedure.

89.   However, it may be necessary to create a "clone" voice mail device that will allow monitors to obtain access to messages left on the Target Telephone after the messages have been left by callers.   In that case, monitors will be notified when new messages have been received by any of the target communication devices.   In the event that such a device is used, it may not be possible to minimize and spot check voice mail messages in the same way that it is possible to do so with ordinary wire communications to a telephone.   In the event that ordinary minimization techniques cannot be used, voice mail messages received by the Target Telephone will be minimized as follows: (a) Each voice mail message will be retrieved from the "clone" voice mail device, recorded in its entirety, and monitored as the message is being retrieved.   The individual monitoring the messages will decide, based upon the identity of the individual leaving the message and the content of the message, whether the message appears to be related to the criminal offenses listed in the court's order or otherwise subject to interception pursuant to the court's order.   Even if one or more of the named intercepts or their confederates, when identified, leaves a message, the message will be deemed non-pertinent if the message does not appear to be criminal in nature or not otherwise related to the offenses under investigation.   If the message appears to

60

be pertinent, the monitoring individual will record the message onto a "working copy" recording.  This "working copy" will contain only the pertinent messages that have been retrieved from the voice mail for the Target Telephone.  Only messages contained on the "working copy" will be provided to agents to further the investigation.  The monitoring individuals will be instructed not to discuss the contents of the non-pertinent calls with any other monitors or agents; (b) If a determination is made that a voice mail message is not pertinent, the message will not be placed on the "working copy" recording used by agents to further the investigation.  If any portion of a voice mail message is pertinent, that entire message will be included on the "working copy" recording; and (c) The complete recording of all intercepted messages, as well as the "working copy" will be preserved and turned over to the court for sealing after the interception order has expired.

## IX.  CONCLUSION

The facts contained in this Affidavit show that there is probable cause to believe that the Target Subjects and unidentified others are using the Target Telephone to facilitate the drug-trafficking offenses discussed in this Affidavit, and that communications concerning those offenses will be obtained through electronic surveillance, authorization for which is requested herein. Normal investigative techniques have been tried and have failed,

61

are reasonably unlikely to succeed if tried or are too dangerous,
Permission is hereby requested to intercept wire communications
to and from the Target Telephone.

I, Terry G. Hanson, having signed this Affidavit under oath
as to all assertions and allegations contained herein, state that
its contents are true and correct to the best of my knowledge,
information and belief.

TERRY G. HANSON
Task Force Agent
Drug Enforcement Administration


Sworn and subscribed to before me this 12th day of March,
2004 at Boston, Massachusetts.

UNITED STATES DISTRICT JUDGE

62

78